Duer, J.
We have lately decided in the case of Tucker v. St. Clement's Church (a), that the words “ pious uses,” in the *359 revised act of 1813, relative to the incorporation of religious societies, must be restricted to such uses as are comprehended within the general objects of a religious corporation, to such as its trustees, where no special direction is given, could lawfully dedicate its property, and as the same words are found in the original act of 1784, and in the same connection, we cannot do otherwise than give to them the same interpretation. It was justly remarked by one of the counsel for the heirs at law, that the terms of the preamble to the act of 1784, furnish an additional proof that the construction we have adopted corresponds with the intentions of the original framers of the law. The main objects of the act are, in substance, declared to be, to ■enable religious societies of every denomination, to provide for the decent support of divine worship, in the form their own judgment and conscience may approve, and, for this purpose, to render them capable in law, of receiving and holding the pious donations of persons desirous to contribute to the support of religion; and. it is a very reasonable inference from this language, that it was never contemplated by the legislature, that any society incorporated under the act should become a trastee for any purpose 'unconnected with the maintenance of its ownfaitb and worship.
The use to which the Trustees of the Methodist Episcopal Orarch are directed by the will to apply the rents and profits of the real estate which is devised to them, seems entirely foreign to the purposes of the institution as a religious society. It is a general charity, not confined to the members of the church, and it may well be doubted whether such a charity can he regarded, as one of the objects to which the trustees of the corporation, in the exercise of their discretion, could lawfully apply its funds. We strongly incline to think that it is not a pious use ” within the meaning of the statute, and were it necessary, would so decide. It is not necessary, however, to place .our decision upon this ground, for admitting that the words “ pious uses ” are to be understood in the largest sense of which they are susceptible, so as to include, not only extrinsie uses, but such as are charitable, as distinguished from those which are pious in the stricter sense of the term, we are, for other reasons, very clearly of opinion, that the devise to the trustees as a corporation, for such is not *360 denied to be its meaning and legal effect, cannot be sustained. It is inconsistent with the prohibitory clause in the statute of wills, (2 R. S., § 3, p. 57,) since it is made directly to a corporation, which, in the words of the statute, is “ not expressly authorized by its charter, or by statute, to take by devise.” The testator, by the addition of a codicil, republished his will after the revised statutes were in force, and thus rendered its construction subject to their provisions, in the same manner as if it had then been originally made. In construing the prohibition in the statute, we cannot reject the word “ expressly,” as superfluous ; we cannot give the same construction to the clause, as if this significant word had not been inserted; for in truth,, it is only by its insertion that the prohibition in the present statute is rendered at all different from the exception in the former; and to remove existing doubts as to the construction of the exception, it appears clearly from the original note of the revisers, was the object of its introduction, (3 R. S. 2d edition.) The evident meaning of the clause, as it now stands, is, that in judging of the validity of a devise to a corporation, the intent of the legislature to enable the corporation to take by devise, is not to be collected by probable reasoning, but that the necessary authority must be given in terms so clear and positive, as not to admit of any other construction ; it must be expressed, not implied. It cannot be said, that the act of 1784 contains an express authority, to the societies' incorporated under it, to take by devise; it is certain, that if such .an authority is given at all, it is given only by implication. Hence, unless we disregard entirely the prohibition in the statute, we must declare that the devise in this case is illegal and void.
It is said, however, that the corporate powers of the church to which this devise is made, cannot be affected by the prohibitory clause in the revised statutes, since the prohibition ought n‘ot to be construed as applying to existing corporations, so as ta take from them any rights or powers which they possessed by virtue of any previous grant. This church has been a corporation more than half a century; it was incorporated under the act of 1784, and the argument is, that if by the fair interpretation of that act, it was authorized to take by devise, this author *361 ity, although given only by implication, could not be revoked or altered by any subsequent action of the legislature. The prohibition in the statute, if construed as such a revocation, would be an unconstitutional exercise of power, which we cannot presume was 'intended by the legislature, and which, at any rate, a court of justice will refuse to sanction. The reasoning is specious, but we are satisfied that it proceeds upon an erroneous view of the powers and intentions of the legislature. The prohibition in the statute, acts upon individuals as testators, and forbids them to make a devise to any corporation, not authorized to take by devise in the manner and terms that the statute requires. The power of individuals to devise their lands, is the creature of positive law, and, as by the repeal of the statute in which it is given, it may be abrogated in toto, it is a necessary consequence, that its exercise may be modified and restricted at the pleasure of the legislature. It is true, that by the repeal or alteration of the statute of wills, the rights of a corporation, as they previously existed, may be incidentally affected, but they are affected not by an alteration of its charter, but by the change of a general municipal law. To make such changes is the province, and frequently the duty of the legislature; its power to make them is inherent and inalienable, and the rights of all persons, artificial as well as natural, corporations as well as individuals, are of necessity subject to" its exercise. As to the actual intentions of the legislature, we are satisfied that the principal object of the alteration in the statute, which the revisers proposed, was to put an end to existing doubts as to the capacity of religious corporations, incorporated under the act of 1813, and previous acts on the same subject, to take by devise and these doubts were meant to be terminated by compelling courts of justice, so to construe these acts, as to exclude the possible implication that such an authority was given. This is rendered evident by the reference made by the revisers to the act of 1813, for they certainly never meant to say, as the counsel for the executors seem to have supposed, that this act, which in its terms is substantially the same as that of 1784, contains an express authority to religious corporations to take by devise; their meaning was directly the reverse.
*362 Let it, however, be admitted that the validity of the devise in. this case is not to be determined by a reference to the prohibition in the revised statutes, but that the sole inquiry is, whether the corporation, to which the devise is made, was authorized to take by devise, by the terms of the statute under which it was incorporated. Our opinion, then, is, that the question to which this inquiry leads can no longer be regarded as open. It is the settled construction of the act of 1784, that the societies incorporated under it have no capacity to take by devise. Nearly half a century has elapsed since this construction was given to the act by the supreme court, in the case of Jackson v. Hammond, (2 Caines’ Cases in Error 337,) and the authority of this decision, and the propriety of the construction which it sanctions, were most distinctly admitted by the court of errors, in McCartee v. The Orphan Asylum, (9 Cowen, pp. 508, 509.) Indeed it was partly upon the authority of Jackson v. Hammond, that the decree in McCartee v. The Orphan Asylum, appears to have been founded.
Nor shall we rest our opinion as to the true construction of the act of 1784, upon the mere authority of the cases to which we have referred; for, although the reasoning of the learned judge who delivered the opinion of the court in Jackson v. Hammond, is not quite satisfactory, of the correctness of the decision itself, we entertain no doubt. It was admitted upon the argument, that the general words in the third section of the act of 1784, by which religious societies, when incorporated, are empowered to have, take, receive, pinchase and acquire, real estate; if construed without reference to other parts of the law, convey no authority to take by devise, so as to repeal, in regard to these corporations, the old exception in the statute of wills; but it was contended that the intention of the legislature, that these general words should be thus construed, is rendered apparent by the expressions used in the fourth section of the act, which contain, it was alleged, a distinct recognition of the capacity of the societies, meant to be incorporated, to take by devise, by declaring or admitting the validity of devises that had been previously made to them. It is, however, very clear to our minds, that the language in the fourth section, which is relied on, contains no *363 such declaration or admission; nor is it possible to believe, that ihe framers of the law had any faith in the validity of devises which as made to unincoiqiorated religious societies, or to their use, were clearly void, both by the rules of the common law, and by the operation of the statutes of mortmain. Indeed, the very terms of the law reveal the conviction of its authors, that the previous gifts, grants and devises, of which they speak, were, upon legal grounds, liable to be defeated. We, therefore, give our entire assent to the observations of Mr. Wood, that the design of the legislature, in the foiu-th section, was only to confirm the societies that might become incorporated under the act, in the possession and enjoyment of the lands and other property which they then held, without any regard to the nature or source of the title under which their possession was acquired. The legislature meant to remedy, so far as its power extended, existing defects of title, but did not mean, as the omission of the word “ devise,” in the fifth section clearly shows, to relieve religious societies, when incorporated, from the exception of the statute of wills, by clothing them with a privilege and authority, which, for centuries past, the policy of the law had denied to all corporations.
As the devise to the trustees, &c., of the Methodist church must be declared illegal and void, we are next to consider what are the consequences of its invalidity. Has the real estate, which it embraces, descended to the heirs at law as in cases of intestacy? or must the trust which is annexed to the devise, be sustained as valid, and be carried into execution under such directions as the court may give ? The counsel for the executors contend, that the trust is valid as a charitable use, and that according to the established doctrine of equity, the disability of the trustee forms no impediment to its execution by the court, while on the other hand, the counsel for the heirs at law, not only deny that the trust is valid as a charitable or public use, but insist that the illegality of the devise, draws after it, as a necessary consequence, the invalidity of the trust, even were it true that if created in a different mode, its execution might be decreed. In our judgment, exactly the same questions arose in the case of McCartee v. The Orphan Asylum, and their decision *364 was of necessity involved in the decree, which the court of errors then pronounced. It may be thought very difficult to reconcile that decree, not only with the English cases, but with prior decisions in this state ; but till an opposite doctrine shall have been established by the court of appeals, we are bound to say that it has settled the law, that a devise to a corporation, not authorized by law to take by devise, if directly made, although clothed with a - trust, is absolutely void, so that the property descends to the heir, not charged with the trust, but as in a case of entire intestacy. The testator is judged to have died intestate as to all the property that the devise embraces. That such is the necessary effect of the decision of the court of errors, a few observations will render apparent.
The devise to the Orphan Asylum Society, which the court, in opposition to the opinion of the chancellor, held to be direct, and therefore' void, was not general, so as to give to the society an unlimited power of disposition or application, but the will expressly directed that the property should be applied to the charitable purposes of the institution, that is, to the support and education of orphans. The devise, therefore, plainly and unequivocally created a trust; and as this trust was for purposes which the legislature, by incorporating the society, had expressly authorized, no doubt could be raised, or indeed was suggested, as to its validity; hence the question, whether, although the devise was void, and the legal estate had descended to the heir, it was not the duty of a court of equity to effectuate the intention of the testator, by decreeing the execution of the trust, necessarily and distinctly arose ;'nor is it possible that it could have escaped the attention of counsel or the observation of the court. We have the most abundant evidence that it did not escape such observation, but was thoroughly investigated and maturely considered. Chancellor Jones, in his elaborate opinion, (an opinion which there is no exaggeration in saying, displays almost unequalled powers of reasoning and research,) after endeavoring to sustain the validity of the devise to the society, states the next question to be, whether upon the supposition “ that the devise was void in law, as being in effect a devise of land to a corporate body, it was not in the power of the court, as a court of *365 equity, to effectuate the intention of the testator,” (9 Cowen 469,) evidently meaning to effectuate his intention by sustaining the trust and decreeing its execution. He devotes nearly twenty pages of his opinion to the examination of this question, and after a full review and careful analysis of the authorities, arrives at the conclusion, that the use to which the testator had devoted his estate, was valid as a charitable use, and the estate chargeable with it as a subsisting trust, and that as chancellor, he had power to establish the trust, and to decree the estate to be settled and conveyed to the uses of the will, (9 Cowen 483;) and, let it be remarked, that if he were justified in these conclusions, his decree, which directed a conveyance to the society to the uses of the will, ought never to have been reversed. It is true, that the learned judge who delivered the opinion which prevailed in the court of errors, takes no notice of these positions of the chancellor, or of the arguments and authorities upon which they were rested; but as he could not have been ignorant that these positions had been taken, it is certain that he and the majority who concurred with him, meant deliberately to reject them; otherwise the decree of the chancellor, although it might have 'been modified, could not have been wholly reversed, and the property have been permitted to descend to the heirs, discharged from the trust. It is impossible to explain the actual decision upon any other ground, than that in the judgment of the court, the devise was absolutely void in relation to the trust as well as the legal estate.
Were it possible for us, however, to evade this conclusion, and escape by any means from the authority of this decision, we should still be compelled to say, that we have no power as a court of equity, to decree the execution of the particular trust which this will creates; we fully admit the general rule, that a trust is not to be defeated merely from the disability or failure of a trustee; but the rule is not to be applied, unless the court, in the exercise of its proper jurisdiction, may decree the execution of the trust. The trust that we are now required to execute, is a general indefinite charity, the persons to whose use and benefit the rents and profits are to be applied, not being designated with certainty in the will, but the selection being left to *366 depend upon a future exercise of discretion. Hence, as from the illegality of the devise there is no trustee, so from the nature of the use there is no oestmi que trust, and in England the rule is fully settled, that in such cases the disposition of the charity belongs to the king as qpa/rms jpatrice, and must be carried into execution under his sign manual, and not by the court of chancery, in the exercise of its ordinary and proper jurisdiction. It would be easy to cite numerous cases as proving the existence of th.e rule, but as all the preceding cases • are reviewed and weighed by Lord Eldon in his elaborate opinion in the case of Moggridge v. Thackwell, it is needless to refer to any other authority. In that case his lordship states, as the result of a most diligent and searching examination, that the general principle most reconcilable to the cases, is, that where the purpose of the charity is general and indefinite, not fixing itself with certainty upon any object, the disposition is in the king by sign manual, and that the court will only take the administration of the trust where the execution is to be by a trustee. (7 Vesey, jr. 63 and 86; Carey v. Abbott, Ibid. 490.) Even in England, therefore, the present trust would be void in equity as well ás at law, and could only be rendered effectual by the direct exercise of the royal prerogative. It is possible that the courts of equity in this state have succeeded to the powers and jurisdiction of the court of chancery in England, in regard to the execution and administration of charities, but we have yet to learn that they have also succeeded to the prerogatives of the crown, or that there is any sovereign, whose directions, as given by his sign manual, they are bound to follow. It must also be remembered, that where the disposition of a charity belongs to the king, his majesty is not bound to follow the intentions of the testator, but that his discretion, in regard to the disposition of the property or fund, is unlimited and Absolute. That courts of equity in this country have ever possessed or claimed a similar discretion, will not be pretended. Hence, even upon the supposition that we possess the same power as a court of chancery in England, to decree the execution of a charitable use, violating in its terms and in its duration, the general rules of law in relation to other trusts, we should still be bound to declare that the present *367 trust, as well as the devise „to which it is annexed, is illegal and void.
The observations that we have made are not, however, to be construed as implying our assent to the positions that were so learnedly and ably maintained by the counsel for the executors and the church, namely: that the law of charitable and pious uses as it prevailed in England anterior to the statute of Elizabeth, or independent of its provisions, (43 Eliz. c. 4,) was in force in this state, as a part of our common law, previous to the adoption of the revised statutes, and remains in force, notwithstanding its entire inconsistency with the statutory provisions in relation to trusts and perpetuities. The authorities to which the counsel referred in support of his argument deserve great consideration and respect; but we cannot think them so conclusive as to preclude us from a free examination of the same questions, if hereafter it shall become our duty to consider and decide them. We shall not decide them in this case, since upon other grounds we are compelled to decide in favor of the heirs, and as a court, we decline to express or intimate any opinion in relation to them. Hence, although the form of this opinion will not be changed, the judge who delivers it is alone responsible for the observations that follow; they are to be considered as an explanation, which for special reasons it is deemed expedient to make, of the difficulties he will have to overcome before he can give his assent to a doctrine, which, in this and in a previous case, with much ability and an unusual display of learning, was pressed upon our adoption.
. We strongly incline to think that the only law of charitable uses, which was in force in this state, on the 19th of April, 1775, as a part of that common law, which the constitution alone recognizes and adopts, was derived exclusively from the provisions of the statute of Elizabeth, and consequently when in 1788, that statute, together with all other English statutes, was repealed, the law was meant and understood to "be wholly abrogated. Although we cannot refer to any positive evidence of the fact, we do not at all doubt that the statute of charitable uses, as the statute of Elizabeth is termed, was in force in this state when a colony, as a part of its common law, in the same *368 manner and for the same reasons ■ as the statute de donis, the statute of wills, the statute of frauds, the statutes of limitations, and many others, and indeed so far as the provisions of this statute were applicable to our condition as a colony, it is not merely a reasonable but a legal presumption that they were in fact adopted. (Dutton v. Howell, Show. P. C. 32; Atty. Genl. v. Stewart, 2 Mer. 159; Rex v. Vaughan, 4 Burr. 2500; Boehm v. Eagle, 1 Dallas, 15; Bogardus v. Trinity Church, 4 Paige, 193.)
Reasoning upon this fact, we find it very difficult to believe that the legislature in repealing the statute of Elizabeth, and in repealing at the same time the statutes of mortmain, (which there is certain evidence were also in force, Sec. 4, Act of 1184, Gtreenleaf, page 12,) meant to revive the equitable, or more properly, the clerical doctrine of pious and charitable uses, as it prevailed in England before the reformation, and during the prevalence of which, Lord Hardwicke says, (1 Yesey, 224,) the clergy and religious houses had contrived to possess themselves of nearly one-half of the whole real property of the kingdom. It is indeed difficult to believe that the legislature meant to revive and establish tills doctrine, not in the modified and regulated form in which it now exists in England, but wholly freed from the numerous and salutary restrictions which the statutes of mortmain impose, and which the experience of every Christian nation, from the earliest ages of Christianity, had shown to be demanded by imperative reasons of public policy; yet it is to this conclusion that the arguments of counsel, and the authorities to which we have been referred, if we adopt and follow them, must of necessity lead us.
It is certain indeed, that such could not have been the intention of the legislature, if when the statute of Elizabeth was repealed, it was understood to be the true and only source of the law of charitable uses, and of the power of the court of chancery to compel" their execution, and that at this time such was the actual belief of the legislature, and of its legal advisers, we think, for many reasons, it is hardly possible to doubt. All doubts upon this point, seem to be excluded when we remember that the belief which we attribute to the legislature, was until a very *369 recent period, the general, if not universal opinion of the members of our profession, including the most eminent of our judges and jurists • throughout the Union, and that this opinion was apparently justified by many decisions in the English courts, and by the positive dicta of several Lord Chancellors. (Gallego's Executors v. The Atty. Genl., 3 Leigh, 450; 2 Story Eq. Jur. 1154, 1158, 1162; 1 Ch. Ca. 134, 269; 6 Dow P. R. 136; Baptist Association v. Hart's Executors, opinion Ch. J. Marshall 4 Wheat. 30 and 39: Baptist Association v. Smith, 3 Peters, App. 403, Mr. J. Story; Atty. Genl. v. Bowyer, 3 Vesey 744, Lord Loughborough; Mills v. Farmer, 1 Meriv. 551, Lord Eldon; 4 Kent’s Comm. 508, n.)
Upon the supposition that charitable uses, as a distinct and peculiar class of trusts, were meant to be abolished, the conduct of the legislature in repealing and not re-enacting the statutes of mortmain, is readily explained, nor, as it appeal's to us, can it be explained in any way. We cannot suppose that the legislature meant to condemn and reject the policy upon which the statutes of mortmain are founded, a policy which the most enlightened statesmen and jurists have constantly approved, and the observance of which, the very nature of our institutions seems to demand. This policy, so far from having been abandoned, had been strictly adhered to and followed, in retaining the prohibition to corporations to take by devise, and in limiting the amount of the property that religious corporations are permitted to hold. The object of these provisions is exactly the same as that of the statutes of mortmain, namely to prevent real property from being locked up in perpetuity, and to save persons m extremis, from being led by false notions of merit or duty, so to dispose of their estates as to impoverish, perhaps leave an actual destitution, their families or dependent relatives, (4 Kent’s Com. 507.) Mor for the attainment of these objects were any further restrictions necessary, if charitable uses when inconsistent with the general rules of law, were meant to be abolished; but if such uses were meant to be continued, the legislature could not have failed to see that the restrictions we have mentioned, were wholly insufficient to prevent the mischiefs they were designed to exclude. It could not have failed to see that in order to carry *370 out and render effectual the policy it had adopted, devises to individual trustees for charitable uses and creating perpetuities, were just as necessary to be prohibited as devises to corporations, nor could its members and legal advisers have been ignorant that this necessary prohibition, was found in one of the statutes, (19 Geo. H. c. 36,) which they were then repealing.- It is indeed evident, that the restraints laid upon corporations are practically of very little value, if every individual, by the creation of a trust, may devote his whole estate, however large its amount, in perpetuity, to any use or purpose that he may deem, or in the confusion and terror of a death-bed repentance, may be led to believe, is pious and charitable. A perpetual trust requires and implies a perpetual succession of trustees, and if we attend to things and not to words, we shall be forced to admit, that to create such a trust, is, in effect, to found a corporation, unlimited in its duration, and incapable of dissolution, having no power to alienate its property, yet unrestrained as to the amount it may hold. Hence it is scarcely possible to state or imagine a more strange and glaring inconsistency, than to prohibit corporations created by the legislature, from taking property by devise at all, and to restrict, within jealous and narrow limits, the amount of the property that, by any means, they are permitted to acquire, yet, at the same time, to permit individuals in the unfettered exercise of then- discretion, to devise all the property they may possess, whatever its amount, to corporations, which by the act of devising they create. Can we believe that the legislature, in repealing the statutes of mortmain, was intentionally guilty of this inconsistency ?' Is it credible that it meant to counteract and defeat its own policy, and the long settled policy of our ancestors? That it meant to take away a restriction plainly necessary, which then existed, and for more than half a century, had been the law of the state, and by so doing, enlarge to a most impolitic extent, the discretionary power of individuals in the creation of charitable uses ? The inference, it seems to us, is far • more probable, that by the repeal of the statute of Elizabeth, this discretionary power, when exercised in hostility to. the general rules of law, was meant to be wholly abolished. The legislature could not surely have meant, by an extension of the *371 power to create perpetuities, to increase indefinitely, the evils that are confessed to flow from them; its object, we are persuaded, was by an absolute denial of the power, to suppress those evils in their source.
If, however, the opinion that we have now intimated, as to the intent and effect of the repeal of the statute of Elizabeth, shall hereafter appear to be erroneous, and we shall be ultimately persuaded that pious and charitable uses, indefinite in their nature, unlimited in their amount, locking up for ever the property which they embrace, and in other respects, wholly irreconcilable to the general rules by which other trusts are governed, were sanctioned by the law of. this state, previous to the adoption of the revised statutes ; yet as such uses are most plainly and directly repugnant to the statutory provisions, in relation to trusts and perpetuities, we confess our present inability to understand or conceive, why they are not now to be considered as positively forbidden, and therefore abolished. That they are embraced within the terms of these statutory provisions, terms as explicit, as strong, and as comprehensive as the language can furnish, it is impossible to deny, and we yet remain to be convinced, that they are not just as certainly embraced within their spirit and policy. At any rate, to declare that they are not, and upon that ground to introduce an exception, which there is not the slightest evidence, was ever contemplated by the revisers or by the legislature, would seem to us, as at present advised, an unjustifiable, if not unexampled, stretch of judicial power. It is said that the revisers, in their notes, make no reference or allusion to charitable uses ; and it is assumed that they would not have been silent, had they meant to abolish them; but it seems far more reasonable to say, that had they meant to except them from the universal terms of the enactments which they proposed, they would certainly have said so, since, had such been their intention, the necessity of a positive exception, in order to prevent misconstruction, could not possibly have escaped them ; on the other hand, if they meant not to except, but to include charitable uses, the explanation of their silence is easy and obvious. They may have deemed it unnecessary 'to speak; they may have thought that the provisions which *372 they recommended spoke for themselves, in a language that neither the legislature nor judges could fail to understand. . The article in relation to uses and trusts commences with this declaration : “ Uses and trusts, except as authorized and modified in this article, are abolished,” (1 R. S. 727, § 45,) and the addition of a note, telling the legislature that all uses and trusts, not excepted, were meant to be included, would have been an idle repetition of a text, which, if words have a meaning, could hear no other interpretation. Hot only are uses and trusts abolished, hut to exclude the supposition that any, previously existing, were meant to he preserved, it is declared, that none are to he excepted hut those which the article itself authorizes and modifies; and that by any comment upon such a text, the meaning of the revisers, and the duty of judges could have been rendered more plain and evident, we exceedingly doubt. Of this we feel assured, that had the revisers intended to revive or continue in force the ancient doctrine of pious and charitable uses, as it practically existed in England during the ages of darkness and superstition, and subject to none of the restraints that constant evasion and successive abuses had shown to be necessary, and successive statutes of mortmain had imposed, they would not have been silent. Their views would not have been concealed from the legislature; hut upon this, as upon all other occasions of importance, if not fully vindicated, would have been fully explained. Comparing their notes with the actual provisions in their text, the just inference seems to be, that they believed that charitable uses, as they then existed, were subject to the general rules of the common law, and, consequently, would he subject to the statutory rules which they desired to substitute. Whether this inference be just or not, our conviction remains, that charitable uses may possibly have been overlooked or forgotten, hut certainly were not meant to he excepted.
It was urged upon the argument as a conclusive reason for excepting charitable uses from the general provisions of the revised statutes, that in England they are held not to be embraced within the general words of an act of parliament; hut ¿however broad and unlimited the terms of the statute, are *373 uniformly treated as an exception which the law implies. In proof of this assertion, we were told that the exception in the statute of wills, (34 and 35 H. VIII. e. 5,) by its terms, renders every devise to a corporation void, whatever its intent or object; and yet a devise to a corporation for a charitable use, it has been frequently decided, as not within the statute, is valid. So, also, that the terms of the statute of uses (27 Hen. VHI. c. 10) are general, comprehending all uses; and yet it has never been held nor supposed that, under the statute, a charitable use is or can be executed. Such uses are an admitted exception. To the argument drawn from the construction of the statute of wills, Oh. J. Marshall has replied and we shall give the reply, without the addition of a word, in his own clear and forcible language. In the case of the Baptist Association v. Hart's Executors, (4 Wheat. 1,) it was alleged by the counsel for the plaintiffs, as a proof that charitable uses were not derived from the statute of Elizabeth, that before the passage of that act, it was held that a devise to a corporation for a charitable use, notwithstanding the exception in the statute of wills, was good in equity. It was in reply to this allegation that the chief justice, in delivering the judgment of the court, said, “We think we cannot be mistaken when we say that no case was decided between the statute of Hen. VIH. (the statute of'wills) and the statute of Elizabeth, in which a devise to a corporation was held good in equity.(a) Such a decision would have overturned principles uniformly acknowledged in that court. The cases of devises that have been *374 held good, were decided since the statute of Elizabeth on the principle that the latter statute, so far as relates to eha/ritiesy repeals the former.” (4 Wheat. 40.) The language of Hr. J. Story, in the most instructive of his works, upon the same point, is just as explicit. “ Devises to corporations,” he says, “ which are void under the statute of Henry VIH., are made good solely by the statute of Elizabeth; for it is plain that a devise, void by statute, cannot be made good upon any principle of general law” (2 Story’s Eq. Jur. 1152); a remark which, considering the subject to which it was applied, is equivalent to saying that where the words of a statute are general, there is no principle of law that can justify a court of justice in creating an exception that is not created by the statute itself.
We cannot here forbear from an observation that seems hitherto to have escaped the attention it deserves. If devises to a corporation for charitable uses, or in trust for a corporation for a similar use, (for it is only upon the same principle that even these have been held to be good, Attorney General v. Downing, Ambl. 550; Adlington v. Andrews, 3 Atk. 141,) are rendered valid in England solely by force of the statute of Elizabeth, it inevitably follows that with us all such devises, since the repeal of that ■ statute, must be void, even upon the supposition that a charity not inconsistent with the general rules of law, may still be created. The plain, unequivocal meaning of the decisions is, that it was competent to the legislature alone to except any class of devises from the operation and effect of the general words in the statute of wills ; and as the exception thus created no longer exists, it follows that those general words must now be understood in the full extent of their meaning, that but for the statute of Elizabeth would always have been given to them, that is, as rendering void every devise to a corporation, or in trust for a corporation, whatever may be its intent and purpose.
As to the argument drawn from the statute of uses, exactly the same reply, were it necessary, might be given, that if charitable uses are an exception from the general words of the statute, they are so only by force of the statute of Elizabeth. But, in truth, no such exception exists. Charitable uses are neither within the scope nor the words of the statute of uses. The only *375 ■design of that statute was to convert equitable into legal estates, by annexing the legal title to the equitable right of possession, but the persons, for whose benefit a charity is created, have no estate or interest in the lands upon which the statute could possibly operate. They are mere beneficiaries, having the right, and nothing more than the right, to compel the performance of the trust, according to its terms, and the intentions of their benefactor. A valid charitable use must always remain, and can only be enforced, as a trust, unaffected by the provisions of the statute; since, considering it simply as a use, there is not, and never can be, any person in whom it can be executed. As the rents and profits are to be applied to the benefit of a succession of persons in perpetuity, there is not, and never can he, a cestui que trust to whom the legal estate, if that of the trustees is divested, can be given, without destroying the charity and defeating for ever the intentions of its founder.
As those that have now been stated were the only instances that were cited to prove that in England, it is an established rule of construction that charitable uses are not covered by the general words of a statute, we must be permitted to doubt, until more pertinent and conclusive evidence shall have been given, whether in the English courts the supposed rule has ever been admitted, or even suspected, to exist We have ourselves been unable to discover the faintest trace of its existence, and until otherwise convinced, must continue to think, with Ch. J. Marshall, that a decision such as the rule would require to be made, would overturn principles that courts of equiiyas well as of law have uniformly acknowledged.
We do not at all share the apprehensions that have been expressed as to the consequences that may ensue, if that construction of the revised statutes shall be adopted, which our remarks have implied to be necessary. The benevolence of Christian and other philanthropists will not he unduly restrained; an ample scope will still be left for its beneficent action. Charitable and public uses are not abolished by subjecting them to the provisions of the revised statutes. For these purposes, if the alienation of the capital is not improperly restricted, donar ¿ions and bequests of money may still be made to any amount, *376 and the proceeds of real estate, directed to he sold, may he similarly apphed. Practically, the principal effect will he fonnd to be, that lands cannot be granted or devised so as to render them thereafter for ever inaEenable, without the assent of the legislature, unless they are granted or devised to a corporation, that by law is authorized to take, and bound to retain them. The necessity of an appeal to the legislature, in other cases where perpetuities are sought to he created, we cannot regard as an evil. When a new and plainly meritorious charity is meant to be founded, such as an hospital, an asylum, a library, a "coEege, or a school, none of us can fear that the sanction of the legislature will ever be withheld; nor will it be deemed a subject of just regret that when the aid of the legislature is required, it will have the opportunity of considering, whether the claims or fair expectations of wives, chEdren, or relatives, have been overlooked and sacrificed. Hnder our present system, such as we suppose it to exist, and considering the restraints that are now laid upon corporations, their incapacity to take by devise, and the limited amount of property which they are permitted to 'hold, we need not the English statutes of mortmain; but revive the English doctrine of pious and charitable uses in its original extent, and the necessity of such statutes wEl soon be apparent. In this, as in every other country, where such uses have been suffered for a time to prevail, without restriction, there will be an inundation of abuses, which the utmost power of the legislature wiE be required to stem, repel, and overcome.
There are some other considerations to which, as suggesting topics of useful reflection, it may be expedient to advert. If charitable and pious uses, without limitation or restraint, notwithstanding the repeal of the statute of Elizabeth, and notwithstanding the express provisions of the revised statutes, now constitute a part of our unwritten law, where shall we find, who shall declare to us, the rules by which they are to be governed ? How are they to be classed, limited, and defined ? What is a charitable? what a pious use? In England, charitable uses are enumerated and defined in the statute of Elizabeth, and it is settled, that none can be sustained as such, that the provisions of the statute may not be construed to embrace. (Brown v. *377 Yeates, 7 Vesey 50 n; Morrice v. Bishop of Durham, 9 Vesey 30, S. C. 10 Ves. 523; Ommany v. Butcher, 1 Turn. & Russ. 260; Vesey v. Sampson, 1 Sim. & S. 69; 2 Story Eq. Jur. § 1155, 56, 57.) Hence, when the question arises, whether a particular use is valid as charitable, it is readily solved by a reference to the statute, and the decisions under it. But to us, as the statute is repealed, neither its terms, nor the decisions under it, can any longer furnish a guide, and either the whole subject must be committed to the uncontrolled and arbitrary discretion of judges, or every trust, that assumes the name and wears the form and face of charity, without discrimination, must be sustained. Benevolence is the most amiable of virtues, and more than any other commands our sympathy and applause; hut more than any other it needs the aid of enlightened reflection, and the direction and control of a sound judgment; and, if the execution of every trust that a mistaken philanthropy may create, must he decreed, courts of equity will frequently discover, that instead of relieving distress, promoting industry, or assisting virtue, they are efficient agents in supporting the idle, encouraging the dissolute, and protecting the criminal.
As to pious uses, if any are to be sanctioned other than those which are included within the general object of religious corporations, the difficulties are still greater. In England, while pious uses are retained, those which have been branded as superstitious have been abolished, and none are deemed pious hut such as are strictly consistent with the orthodox faith of Protestant Christians. But with us, it is plain, that no such distinction can be admitted. With us, as all religions are tolerated, and none is established, each has an equal right to the protection of the law; and, consequently, all uses directed to a religious object must be equally proscribed, or all must be upheld as pious, which are consecrated by the faith of any description or class, not merely of Christians, hut believers. Hence, if the Presbyterian and the Baptist, the Methodist and the Protestant Episcopalian, must each be allowed to devote the entire income of his real and personal estate, for ever, to the support of missions, or the spreading of the Bible, so must the Roman Catholic his, to the endowment of a monastery, or the *378 founding of a perpetual mass for the safety of his soid; the Jew his, to the translation and publication of the Mishna or the Talmud, and the Mahommedan, (if in that colluvies gentium to which this city, like ancient Rome, seems to be doomed, such shad be among us,) the Mahommedan his, to the assistance or relief of the annual pilgrims to Mecca,
Upon the whole, we are certainly inclined to think that it is better that judges shall say, as it seems to us the legislature has said, that no use or trust can be valid that the revised statutes have not authorized, and that the absolute power of alienation, in respect both to real and personal estate, shall not be suspended for a longer period than the statutes allow, “ by amy limitation or condition whatever.” (1 R. S. § 15, p. 723; § 1, p. 773.) These rules, as general, we believe are safe and salutary, and when in special cases they need to be relaxed, the legislature has the power to relax them. That power has already, in many cases, been wisely and beneficially exercised. (Laws 1840, ch: 318, § 1, 2, 3, 4; Laws 1841, ch. 261; Laws 1839, ch. 174, § 1, 2, 3; Laws 1839, ch. 184, 2 R. S. 3d ed. pp. 23, 24, 25.)
And let it be remembered, that by its exercise, the legislature has virtuady adopted that construction of the statutes which we have supposed that their terms necessarily import. And that the revisers, by incorporating the provisions of the acts to which we refer, in a separate article, in the title relative to the nature and qualities of estates in real property, have clearly shown that they regarded them as exceptions to the general rules which that title was meant to establish. (2 R. S. 3d ed. p. 23.)
We shad not pursue remarks which, although they are far from having exhausted a. subject of wide extent and deep interest, have led us further than we intended, but shad proceed to state briefly the result of our opinion. As we have declared that the devise to the trustees of the Methodist church, and the trust annexed to it, are illegal and void, it is a necessary consequence that the direction to the executors to accumulate the residue of the personal, and the rents and profits of the real estate, for the purpose of building a house upon the lot in Brooklyn, cannot be supported. That direction could only have been sustained as ancidary to the principal trust, and therefore a con *379 stituent part of a valid charitable use. Separated from the trust, it is clearly void, not only from the failure of its object, but as directing an accumulation for a purpose not authorized by law, and as involving an indefinite suspense of the power of alienation.
A decree must be entered in conformity to the views we have expressed, declaring that the devise of the lots in Hew York and Brooklyn, is absolutely void, and that the property devised has descended to the heirs at law as in a case of entire intestacy; also that the next of kin and heirs at law are entitled to the accumulated fund in the hands of the executors, directing a reference to a suitable person to take the accounts and to ascertain and report who are entitled to take as next of Icin and heirs at law, and in what proportions, and reserving all further directions until the coming in of the report. The taxable costs of all the parties, and the reasonable counsel fees of the executors, are to be paid out of the funds in their hands, and as they have acted in good faith, they are also to be allowed the usual commissions upon the sums received and expended by them, including those arising from the real estate.

 Ante, page 242,

 It is, however, made perfectly certain by the publications of the English Record Commission, since the decision in 4 Wheaton 1, that the learned and venerable chief justice was wrong in this statement. This is conceded by Story, J., delivering the opinion of the court in the Girard will case, 2 Howard’s U. S. Rep. 192 to 196, and is abundantly shown in Mr. Binney’s argument in that case, at pages 146, 155 to 161, note. See a contrary view of the points at page 179, note to the argument of Mr. Cadwallader, for the plaintiff. Mr. Justice Story, in 2 Howard 192, mentions that the Baptist Association—the plaintiffs in 4 Wheaton, was not a corporation. See further on the subject of charitable uses in England, gifts to corporations for such uses, and the jurisdiction of the court of chancery over charitable uses, before the statute 43d Elizabeth; Attorney General v. Mayor of Dublin, 1 Bligh’s R. 312, 347; Incorporated Society v. Richards, 1 Drury & Warren, 258; 2 Mylne & K. 581; 2 Sand. Ch. R. 46, 50.