WILLIAM F. BASCOM and others, Appellants, v. CAROLINE B. ALBERTSON and others, Respondents.

A bequest, by a New York testator, to such persons as the judges of another State may appoint after his death to receive it, is ineffectual for any purpose, if unlawful in the State of his domicile.

Such a bequest to persons unknown, for the general purpose of founding, establishing and managing, in another State, an institution for the education of females, is void under the laws of New York.

It has been the settled policy of this State to encourage donations and endowments for educational, religious and charitable purposes, by providing for the administration of such funds through organized and responsible agencies, sanctioned by legislative authority, and subject to legislative regulation and control.

Such gifts, if otherwise valid, are upheld in our courts, when made to institutions or societies having authority by charter or by law to receive them, and when the purposes contemplated by the donors are within the range of the objects of such societies, and the scope of their general powers.

The English system of indefinite charitable uses has no existence in this State, and no place in our system of jurisprudence.

The authority which, prior to the statute of 43 Elizabeth, was exercised by the English Court of Chancery in respect to pious and charitable uses, as distinguished from other uses and trusts, was not a part of its original and inherent judicial power as an equity tribunal, but a branch of the jurisdiction it assumed to exercise, in virtue of the royal prerogative and the *cy pres* power, with which the courts of this State have not been invested.

By the statute of 43 Elizabeth, various abuses of the previous system were remedied, and the law of indefinite charities was substantially codified; certain enumerated uses of this nature being sanctioned by parliamentary authority, and all not thus sanctioned being permitted to fail.

The new abuses which grew up under this statute led to the adoption of further parliamentary restraints, in the mortmain act of 9 George II, ch. 36.

The design and effect of the repeal of the statute of Elizabeth and the mortmain acts, by the legislature of 1788, was to abrogate in this State the English law of indefinite charitable uses; and our subsequent legislation has supplied a complete and harmonious system of charities, sanctioned by legislative authority, subject to statutory regulation, and adapted to the condition of our people and the nature of our institutions.

There is nothing to withdraw gifts to mere private trustees, for indefinite charitable uses, from the operation of the provisions of the Revised Statutes in relation to uses and trusts, perpetuities and the limitation of future estates; and the prohibitions contained in these statutes are in direct contravention of the English law on this subject, as it existed at the time of the revolution, when our first Constitution was adopted.

The cases of *The Baptist Association* v. *Hart's Executors* (4 Wheat., 1); *Galleygo's Executors* v. *Attorney-General* (3 Leigh, 474); *Ayres* v. *The Methodist Episcopal Church* (3 Sandf., 357); *Yates* v. *Yates* (9 Barb., 345); and *Fontain* v. *Ravenel* (17 How. U. S., 369), in accordance with these views, approved; the case of *The New York Protestant Episcopal School* (31 N. Y., 574), explained; and the cases of *Shotwell* v. *Mott* (2 Sandf. Ch., 46), and *Williams* v. *Williams* (4 Seld., 525), so far as they are inconsistent with these conclusions, overruled.

THE appeal is from a judgment affirming the decree of the surrogate of the county of New York, made July 3d, 1860, on the final accounting of Lewis B. Brown, executor of the will of David Nichols, deceased.

The appellants are William F. Bascom and four others, residents of Addison county, in the State of Vermont, claiming to be trustees appointed by an order of the Supreme Court of Vermont, made at a term held on the first Tuesday of January, 1860 (four of the six judges being present), upon filing a copy of the will; and also claiming to be trustees under a written *memorandum* of appointment of the six judges of the Supreme Court of Vermont, signed by four of them, at Burlington, on the 11th of January, 1860, and by two of them at St. Albans, on the 17th of that month; both appointments being for "the purpose of receiving any and all bequests, gifts, legacies or devises in said will contained, for the purpose of founding an institution for the education of females, to be located in the town of Middlebury, in the State of Vermont, and to found, establish and manage said institution according to the will of said testator and the laws of the State."

These two appointments were procured in order to conform with the different modes of appointment pointed out in the second section and in the residuary clause.

The respondents are Caroline A. Albertson, late Nichols, the widow, George M. Nichols, the brother, and the five sisters of testator, and Lewis B. Brown, the executor.

The will was executed at New York on the 21st of August, 1857. The testator died in that city in February, 1858; and on the 5th of April following, his will was admitted to probate in the county of New York, and letters testamentary

were issued to Lewis B. Brown of that city, the only executor who qualified.

The testator, at the time of his death, was a resident of New York, and his personal property was in this State. The will does not appear to have been proved in Vermont.

His estate amounted to about $150,000. The only question involved is the validity and effect of two clauses of the will.

The residuary clause is as follows:

"All the rest, residue and remainder of my property and "estate, of whatever kind and wherever situated, and whence- "soever derived, I give, devise and bequeath unto the five "persons who shall be named and appointed as trustees by "the Supreme Court of the State of Vermont, to found and "establish an institution for the education of females, to be "located in Middlebury aforesaid, and of which mention is "hereinbefore made."

By a previous clause in the will, the testator had given to the respondent Brown $85,000, in trust, to invest and pay over the interest and income to his wife, Caroline B. Nichols, during her life, and on her death, leaving a child or children surviving her, to pay over to such child or children three-fourths of the above named principal sum, and the remaining one-fourth to his four sisters, naming them. Then follows this provision:

"And in case of the death of my said wife leaving no "children her surviving, then I direct the said trustee to pay "over the said principal sum of eighty-five thousand dollars, "as follows: The sum of twenty-five thousand dollars, parcel "thereof, to be paid over to such five persons, residents of "the county of Addison, in the State of Vermont, as shall "be named and appointed by the judges of the Supreme "Court of the State of Vermont, to be trustees to found, "establish and manage an institution for the education of "females, to be located in the town of Middlebury, in said "State of Vermont, &c., &c."

The testator left no children. He left a widow, Caroline B.; four sisters, Jane, Emeline, Elizabeth and Martha; one

brother, George, and a half-sister, Adelaide P. Jackson. His widow has, since the pendency of this appeal, married Daniel F. Albertson.

On an accounting before the surrogate of New York, on the 7th of November, 1859, the residue of the estate was ascertained to be $13,555.77, all in personal property.

On the final accounting the appellants were summoned to appear, and the clauses under which they claimed were adjudged to be invalid. Their appeal is from the judgment affirming that decree.

*Theodore W. Dwight,* for the appellants.

*Alexander W. Bradford, David R. Jaques* and *George F. Comstock,* for the respondents.

PORTER, J. The testator was a resident of this State at the time of his decease, and the validity of his bequests must be determined under our laws. The record raises no question as to their validity in another jurisdiction; and if it had been shown as matter of fact, that the laws of Vermont in this respect differ from our own, the proof would have been unavailing. The estate consisted exclusively of personal assets here; and the legacies in question were payable to such persons, then unknown, as might be appointed in that State after his death, to act as trustees in establishing and managing at Middlebury an institution for the education of females. This being the nature of the bequests, they cannot be sustained and enforced if they are void under the law of the testator's domicile. (*Wood* v. *Wood*, 5 Paige, 596; *Curtis* v. *Hutton*, 14 Vesey, 537; *Banks* v. *Phelan*, 4 Barb., 88; Hill on Trustees, 454, 468; *Phelps* v. *Pond*, 28 Barb., 127; *S. C.* affirmed, 23 N. Y., 69.)

Before proceeding to consider the principal questions, it will facilitate our inquiries to advert briefly to the aspect of the case as presented by the record. On the final accounting before the surrogate, the appellants insisted that the residuary fund should be paid over to them. They did not claim to be entitled to payment of the primary legacy of $25,000, as

the widow of the testator was still living; and even on the assumption of the validity of that bequest, it was uncertain whether the contingency would ever arise which would entitle them to claim that portion of the fund. The surrogate decreed that each of the bequests was void; and we think his conclusion was right, though the immediate and practical question was as to the claim founded on the residuary clause.

It is obvious that in respect to the projected charity, the testator had no clear and definite scheme. He appointed no trustees and designated no beneficiaries. The females to be admitted to the benefits of the proposed institution in Middlebury were limited to no class, condition or race. The beneficiaries, if any, entitled to an equitable interest in the gift, consisted of the uneducated portion of one-half of the human race. He gave no directions as to the plan of the institution, or the manner in which the fund should be applied. He indicated no mode of selecting those to be admitted as inmates, and he neither interdicted nor enjoined gratuitous instruction. If a scheme could be devised to carry out his general purpose, it might be effective, but it would not be his. It must be contrived either by the unknown trustees to whom he supposed he was delegating the authority, or by the Supreme Court of Vermont, to which, as the appellants claim, it was delegated by law, notwithstanding his directions. He seems to have acted under an impression that nothing was essential to the creation of a trust for a benevolent end, but a fund, a purpose and a name; or that if anything more was needful, it could be supplied by others, under an implied authority in the nature of a posthumous power of attorney. The surrogate and the Supreme Court thought otherwise, and in their view we concur.

It is claimed that the gift and trust can be upheld within the rules supposed to have been established in the case of *Williams* v. *Williams*. (4 Seld., 524.) Without pausing at this point to consider how far the doctrines enunciated in that case have been subverted by subsequent decisions, we

think the appellants are environed with difficulties which. would be fatal to the gift in question, even if those doctrines could be successfully maintained.

It is conceded on all hands that the theory of the *Williams Case* ought not to be extended; and, indeed, from the time that decision was made, the only question mooted in regard to it has been, whether it could be so limited as to be upheld. Beyond the precise point in judgment it cannot be invoked as a precedent; and we shall presently have occasion to consider the question whether, even to this extent, it. can be recognized as a binding authority, in view of subsequent adjudications by the court in which it was decided. But the appellants in the present case are compelled to maintain propositions which, though incidentally discussed, were neither involved nor determined in the *Williams Case.* There the issue was as to the validity of two bequests, each in favor of designated donees, and each vesting on the death of the testator. One was to a religious corporation, legally authorized to take and hold in perpetuity, and the legacy. was to be applied to the uses for which the society was organized. The other was to three persons by name, directing the application of the fund to the education of the children of the poor in Huntington, at the academy in that village, and also directing the selection, without discrimination of denomination or complexion, of children whose parents were ·not named on the tax list; and if there were not enough of these to absorb the annual income, the children of those who were lowest on the tax list. The will prohibited the application of the fund to purposes of building or repair, and limited it to the strict.expenses of ordinary English education. It also contained apt and appropriate provisions for preserving a succession of trustees to apply the fund. It did not leave it for the judges to supply donees, nor for the courts to found institutions and to project vague and indefinite schemes of charity. What the majority of the court adjudged, and all it adjudged, was that a gift thus definite and certain, vesting in designated trustees immediately upon the death of the testator, with no intermediate

suspension of ownership, could legally be upheld. If that decision was wrong, the judgment in the present case should of course be affirmed. But the appeal now under consideration presents additional issues of the gravest public importance. We cannot reverse the judgment rendered by the Supreme Court in favor of the respondents, unless we are prepared to affirm it to be the law of this State:

1. That any citizen can create a valid and effectual trust, existing *proprio vigore*, with neither trustee nor *cestui que trust.*

2. That any testator can make a gift of his estate, designating no donees, either of the legal title or of the equitable interest, which shall yet be effectual to withdraw his property from the operation of the statutes of descent and distribution.

3. That any citizen may lawfully ordain by will, that his property shall vest at his death in no human being and no corporate body, and that the absolute ownership and power of alienation shall be suspended for an indefinite period thereafter, not measured by lives in being.

4. That the *cy pres* doctrine of the English courts of chancery exists in this State, and that the Supreme Court, in a case like this, is clothed with the power and charged with the duty of devising a scheme of charity and decreeing its execution, though none was framed by the testator.

No sanction for these propositions can be found in the laws of this State. Our own decisions lie in the path between us and such a judgment. We could only reach such a result by overruling six deliberate adjudications of this court, all subsequent to the *Williams Case.* (*Owens* v. *The Missionary Society,* 14 N. Y., 380; *Leonard* v. *Burr,* 18 id., 96; *Phelps* v. *Pond,* 23 id., 69; *Beekman* v. *Bonsor,* id., 298; *Downing* v. *Marshall,* id., 396; *Rose* v. *The Rose Benevolent Association,* Oct. Term, 1863.)

We have no such anomaly here, however it may be elsewhere, as a creation of a trust by a testator, without either a trustee to take the legal title, or a beneficiary to claim the equitable interest. The protest of this court against the alleged sanction of such a doctrine by the judgment in

the *Williams Case*, was prompt, repeated and emphatic. Thus it was said by Judge SELDEN in *Owens' Case*, in the course of his observations on the jurisdiction of the English Court of Chancery, as aided by the royal prerogative and the doctrine of *cy pres*, but irrespective of the statute of Elizabeth: "It is true, that where trustees capable of taking the legal estate were originally appointed, *so that a valid use was in the first instance raised*, and the case was thus brought within the jurisdiction of the Court of Chancery, that court would not *afterward* suffer the use to fail, but would supply any defect which might arise in consequence of the death or disability of the trustees, by appointing new trustees in their place; but when no competent trustees were in the first instance appointed, *so that no legal estate ever vested*, of course no use was raised, and the Court of Chancery acquired no jurisdiction in the case." (14 N. Y., 406.) He adverted also to the fact that this was the precise ground of judgment in the *Williams Case*, where Judge DENIO, in delivering the opinion of the majority of the court, expressly concedes, that in the original distribution of powers among the departments of our State government, the courts are clothed with none but judicial power, and do not succeed to such jurisdiction as the English courts of chancery exercised, in virtue of the royal prerogative or of the indefinite doctrine of *cy pres*. "But in this case," he adds, "there is no occasion for an executive sign manual, or for the application of what is called the *cy pres* doctrine. There is here *a good trustee to take the funds in the first instance;* and a succession of trustees may be provided by the court by new appointment as often as circumstances may require." (4 Seld., 348, 349.) The proposition that a trust for undefined beneficiaries is void under the law, in the absence of a trustee to take the legal title in the first instance, was reaffirmed in the subsequent cases of *Phelps* v. *Pond* and *Beekman* v. *Bonsor*. (23 N. Y., 77; id., 311.) It does not follow from this proposition, that where there is a *valid* trust for ascertained beneficiaries, it will be permitted to fail for want of an original trustee; for, in such a case, chancery will supply the defect in the exercise of its ordinary jurisdic-

tion over trusts in general. Neither does it follow that a trust for undefined beneficiaries, void in itself for uncertainty, is rendered valid under our law by the designation of a trustee in the first instance to receive the nominal legal title; though there is a *dictum* to that effect in *Owen's Case* which is repeated in the *Beekman* and *Downing Cases*. (4 Kern., 406; 23 N. Y., 310, 382.) In neither was it the point in judgment; and in both the suggestion was made in deference to views expressed in the *Williams Case*, which the court was reluctant to overrule. It is quite true that in the English Court of Chancery such a trust would have been supported under the statute of Elizabeth; and we are convinced by the able and lucid demonstration of Professor DWIGHT, that it might have been sustained in that court prior to and irrespective of the statute; but we think it would have been in the exercise of its jurisdiction, as enlarged and aided by the royal prerogative and the *cy pres* power, which do not appertain to our judicial tribunals, in the absence of a special grant from the legislative department of the government. (*Fontain* v. *Ravenel*, 17 How., U. S., 392, 393.)

The trust which the testator in this instance attempted to create was singularly vague and indefinite. He not only designated no donees of the legal title, and no beneficiaries in the equitable interest, but he indicated no specific and ascertainable class of females as the objects of his bounty, and gave no directions for the foundation of the proposed institution—"capable of being executed by judicial decree" —a condition essential to the validity of the bequest, as conceded even in the *Williams Case*. (4 Seld., 548.) The gift in question could not be sustained under the authority of that decision; and certainly not within the limitations of its doctrine in subsequent cases. If a testator desires, for his private behoof, to found a charity in his own name, and to endow his trustees with corporate attributes, free from corporate responsibility, he must at least project his own scheme, declare his own will, and not cast upon the courts the burden of completing a work which he has left undone. It is not the province of the judges to project schemes of charity for

insertion in dead men's wills, by way of supplement to partial declarations of trust, void on their face for uncertainty.

Thus, in the case of *Owens* v. *The Missionary Society*, the language of the gift was: "I give and bequeath all the residue of my said estate, after the death of my said wife Mary, to the Methodist General American Missionary Society, appointed to preach the gospel to the poor." There was such a voluntary association; and after the death of the testator it was incorporated, for the benevolent purposes for which it had been originally formed, comprehending that indicated in the testator's will. The bequest was held to be void; and six of the judges were of opinion "that the judgment should be affirmed, on the ground that the object of the charity was not sufficiently defined by the terms of the will." (14 N. Y., 380, 412.) In the will of Anson G. Phelps, he stated that it had been "contemplated by the friends of African colonization to erect and found a college in Liberia, Africa, and it is understood that some incipient steps have been taken for that purpose by its friends in Boston, Massachusetts." In furtherance of that purpose, he directed his executors, in a specified contingency, to pay $50,000 in aid of the enterprise, and added: "I wish my executors especially to have in view the establishment of a theological department in said college, to be under the supervision of the Union Theological Seminary of the city of New York." It was held that the bequest was void, as involving a perpetuity prohibited by the statute; but the court took occasion to say, in pronouncing its judgment: "It is doubtful whether the object to which this fund is to be devoted, as described in the will, is sufficiently definite to support the bequest, even if there were no other objection to its validity. The peculiar doctrines of the English Court of Chancery, in respect to charitable uses, having never been adopted in this State, trusts for such purposes cannot be sustained, unless the object of the trust is defined with clearness and precision." (*Phelps* v. *Pond*, 23 N. Y., 69, 77.)

In the case of *Beekman* v. *Bonsor*, the provisions made by the testator were characterized by COMSTOCK, Ch. J., in terms

scarce less appropriate here: " All that we can ascertain from the language of the testator is, that he had in his mind a vague and shadowy conception of a dispensary, similar to those in the city of New York, without any determinate views as to the place of its foundation, *the mode of perpetuating and governing it,* or the amount of expenditure and investment necessary to establish and maintain it." It was well said, in that case, that " the testator, in effect, declared that he had devoted a blank sum of money to found and perpetuate an institution of charity, which, in his mind, was also a blank as to everything except the general purpose which he designed to promote." (23 N. Y., 306.)

Our courts of equity have no authority to found charities, even on the theory of the Williams case. The testator must devise his own scheme, and not impose upon the judicial tribunals the burden of consummating it for him, otherwise than by decreeing the execution of what he has definitely and lawfully ordained. " As judicial power," in the language of the case last cited, " is exercised in the interpretation of wills, and in establishing them as made by testators, and not in framing them, this difficulty is incurable. In England, the *cy pres* power would be exerted in such a case, and a scheme would be devised by a master of the Court of Chancery, or the crown would appoint the charity under the sign manual. In either mode of exercising that power, it rests upon *prerogative,* and is a creative energy, which, as we have seen, does not belong to our judicial system." (23 N. Y., 311.)

In the case of *Downing* v. *Marshall,* a very able opinion was delivered by the then chief judge, which, in principle, is decisive against the validity of the bequests, even if the authority of the Williams case had never been questioned. " We think," said the court, " that the residuary devise and bequest were void as to the unincorporated Home Missionary Society. That society is composed of a fluctuating and unascertained class of persons, having no legal capacity to take the gift. The beneficiaries are the entire community within the influence of the society. There is no trustee competent to take the fund, so as to secure its appropriation to the

benevolent purpose intended.    That such a gift is void accord-
ing to legal rules, it needs no argument to prove.    There is
no trustee, and there are no beneficiaries ascertained, either
as individuals or as a class of persons.    These objections are
fatal.    It is said that a trust shall never fail for want of a
trustee, because a court of equity will supply the defect.
But this is true only of a valid trust; and, in order to be
valid, it must be so constituted that a title can vest in some
person, natural or artificial, by force of the gift itself." (23
N. Y., 382.)

The residuary bequest, in the present case, was void, on
the further ground that the gift was contingent and executory·;
and that it involved an˙ illegal suspension of the absolute
˙ownership of the fund, which was left swinging in abeyance,
until donees should be appointed by the judges of another
State to receive it.

The testator died in February, 1858.    The acting executor
took possession of the assets on the 5th of April following,
when the will was admitted to probate.    He was not a trustee
for the purposes of the projected charity, and did not hold
the fund in that character.    The sole duty with which he
was charged, in this respect, was to pay over the money on
the claim of the unascertained trustees.    In the meantime, it
was to remain in his hands, subject to the uncertain contin-
gency of the acceptance and exercise by the Vermont judges,
of an authority conferred on them, not by the law of the land,
but by the will of a New York testator.    That authority was,
in effect, to complete his will for him after his death, by
appointing donees of a considerable portion of his property.
The executor had not the power, even if he had the inclina-
tion, to compel the judges, either to agree on five appointees,
or to renounce the right of doing so at a future period.
Meantime, the absolute ownership of the fund must, of neces-
sity, remain in suspense.    It so happened that, some two
years after the death of Mr. Nichols, and when the next of
kin was entitled to the money unless the trust could be estab-
lished, the executor volunteered to procure a selection of
trustees by the judges; and, though no scheme has ever· been

devised for carrying the trust into effect, and, though there are no beneficiaries to apply for its enforcement, these appointees interpose their claim to the fund, as against the widow and the brother and sisters of the testator.

It is manifest that the gift did not vest at the death of the donor. It was to persons neither known nor ascertainable at the time of his decease. Who might they be, was to depend on the future pleasure of a fluctuating body of jurists in another State, who were under no obligation to fill up blanks in the will of a New York testator, and whose action no tribunal could compel, and no human being could foresee. The power of appointment might be exercised in six or in sixty years. It might or it might not be invoked. It might devolve on the then incumbents of the judicial office, or on judges thereafter to be born. It is obvious, therefore, that the designation of donees must, of legal necessity, precede the vesting of the bequest. The gift was to unascertained parties, on an undefined trust, and to the use of unknown beneficiaries; and it was ineffectual, under the familiar rule, that all limitations by a testator are void, which suspend the absolute ownership of the personal property he bequeaths, for a definite or indefinite period not bounded by lives in being. (1 R. S., 733, § 1; *Yates* v. *Yates*, 9 Barb., 325, 347; *Boynton* v. *Hoyt*, 1 Denio, 54; *Phelps* v. *Pond*, 23 N. Y., 69.)

Under our law, a bequest which does not vest in definite donees, either in law or equity, on the death of the testator, or within a period thereafter measured by lives in being, can never vest. Any intermediate suspension of ownership, however short, violates the statute and defeats the gift.

The bequest in the present case either did or did not vest. If it did, an ingenious man should be able to say in whom. If it did not, it was executory; and this court has repeatedly adjudged that such a gift is within the condemnation of the statutes prohibiting perpetuities.

That this is so in respect to real estate devised to the uses of charity, was conceded in the case of *Leonard* v. *Burr*. The devise, there, was to the trustees of the village of

Gloversville, *when it should be incorporated*, for the purpose of establishing a village library. Judge DENIO, in his opinion, cites the statute against perpetuities in lands as applicable to the gift, and says, in language which we think equally appropriate to the present case: "The charitable gift might not take effect until some very remote period, or it might not take effect at all, though there might remain a possibility that it would arise, and thus the estate would remain inalienable for an indefinite period, without the devotion of any of its income to the purposes of charity." (18 N. Y., 107, 108.)

The same proposition was affirmed in respect to the charitable bequests of personal property in the Rose will case. The court said, in strong and emphatic terms: "In determining the question whether the vice of perpetuity attaches, it is of no significance that the limitations are to what are understood as charitable objects. Charitable donations, of a public nature, form no exception to the law against perpetuities; at least while they remain contingent and executory. Estates, although given to charitable uses, must vest within the time prescribed by law."

In the case of *Phelps* v. *Pond*, where, under the provisions of the will, the bequest would be for a time in abeyance after the death of the testator, the court said: "There is another objection to this legacy which is entirely fatal to its validity. It is not only made upon a contingency, but a contingency *which may never happen;* and yet there is no limitation whatever to the period of suspense. If the legacy is valid the executors would be bound to provide a fund for its payment; and the absolute ownership of the fund would, of course, be suspended in the meantime, as the legacy *could not become vested* until the happening of the contingency. *Such a legacy is in direct contravention of the statute against perpetuities.*" (23 N. Y., 77.)

So, in the present case, the gift could not vest until there should be donees to take; and no donees were authorized to take at the testator's death under the provisions of the will. They might, or might not, be afterward provided. They might be provided in a year and they might not in a genera-

tion. The judges of Vermont, certainly, had no greater authority to appoint donees in trust for a New York testator, than the legislature of this State had to incorporate the village of Gloversville. They were under no more obligation to complete for him a declaration of trust which he chose to leave incomplete, than the legislature of New York to confer ordinary municipal rights on one of its unincorporated villages. There was no human being charged with the duty or clothed with an interest under the testator's will to put the judges in motion. When he died, the trustees, to be thereafter appointed by the Vermont judges, had no more existence than the trustees of Gloversville, to be thereafter appointed under the authority of our State legislature. It happened in that case that Gloversvile was incorporated after his death, and its trustees claimed the bequest; as in this case it also happens that trustees have since been appointed by the judges to claim the fund in dispute. In neither case did the donation vest at the death of the testator. In each the gift was executory, and the estate in abeyance. In each there was a period of suspense not measured by lives, and condemned by law. Neither the Supreme Court of Vermont, nor the individual judges, could by their subsequent action impart validity to a New York will which was void at the testator's death.

It is thus settled by a series of well considered decisions, that a testamentary gift to charitable uses, if open to no other objection, is within the statutes in relation to perpetuities, if it is not to vest at the testator's death, or within a period thereafter bounded by human life. In this case, there was no limitation upon lives in being, in respect to the residuary fund now in question, and there were no donees competent to take at the time of the testator's death. The objects of each of the bequests to charity were uncertain and undefined, and the trust was incapable of execution by judicial decree in force of the gift itself.

It is strenuously insisted, however, that we are bound to uphold the testator's scheme, under the authority of the decision in *Williams* v. *Williams*. (4 Seld., 525.) The coun-

sel for the appellants suppose it to be of controlling force in their favor; and while this is denied by the counsel for the respondents, they claim that the decision in that case was erroneous, and that it has since been substantially overruled. The present appeal raises, among other questions, those which were there determined; and both parties have a right to claim our judgment as to the force and effect of that decision on the principal issue involved.

We entertain no doubt that the bequest, in that case, to the Presbyterian church in Huntington was properly upheld. It was a gift to a religious corporation, legally authorized to take and hold the fund for purposes within the scope of its charter. The validity of the bequest to designated trustees, for the benefit of the children of the poor, rested upon very different considerations. In order to sustain it, the court found it necessary, among other things, to hold that our tribunals in equity, notwithstanding the repeal in 1788 of the statute of 43 Elizabeth and the mortmain acts, were invested with a common law jurisdiction to establish and enforce such trusts; and that testamentary gifts to the uses of charity, though within the terms, were not within the operation or intent, of our general statutes regulating and limiting uses and trusts, and forbidding perpetuities unauthorized by law.

It was erroneously assumed on the argument, that these doctrines were subsequently sanctioned by this court in the case of the *New York Protestant Episcopal School*. (31 N. Y., 574.) It is true that they were reaffirmed by the eminent judge who delivered the opinion in that, as in the Williams case; but the fact is not to be overlooked, that in the published report of the decision it appears that the concurrence of the other judges was not in the opinion, but "in the result." It is well known that several of them entertained views directly opposed to those expressed in the portion of the opinion referred to; but they concurred in the reversal on other grounds. The appeal was from an order discharging purchasers from their bid at a public sale. It is true that the premises in question, with other lands, were included

in a devise by one John Baker, who died in 1796, giving the property, subject to a succession of life estates, to the governor of the State for the time being, in trust for the scholars in the charity school of Trinity church. The testator left no heirs capable of taking by inheritance; and his interest, if the will failed, escheated to the State. When the charity school was incorporated, in 1806, the legislature, representing the State and standing in the place of the heirs, confirmed the gift, and declared the estate so devised to be vested in the corporation. The devisees for life also conveyed their interest to the society, which, having thus acquired the entire title, procured an act of the legislature in 1859, authorizing sales of part of the premises, for the purpose of paying assessments which were a charge upon the whole. Pursuant to the act, a sale was authorized by the court. The purchasers objected to receiving the title, claiming that the two acts of the legislature were unconstitutional; and also insisting that by the true construction of the devise, the gift did not vest in the governor in office at the decease of the testator, but would vest in a future incumbent of that office at the termination of the life estates. This court held otherwise, and sustained the validity of the two laws alleged to be unconstitutional. Neither party claimed that the devise was void; and that question was not before the court for decision. The purchasers might have raised it, but they did not choose to do so, and for the obvious reason that by doing so they would have defeated their objections to the title; for, if the devise failed, the lands escheated to the State, which had confirmed them to the corporation. The only additional force the Williams case can derive from this is the fact which it discloses, that the learned judge by whom the opinion was delivered, adhered to the views he had originally expressed on the subject of indefinite charitable uses.

A general reference to the antecedent state of the law on this subject will aid us in the inquiry it is our duty to make, as to the correctness of those views, in the light of previous and subsequent decisions. An appropriate stand point for a retrospective glance at the system as it prevailed in England,

is found in the occasion on which our State government defined its own policy, by repealing the statute of 43 Elizabeth, and the various restraining acts, culminating in the memorable mortmain act of 9 George II, ch. 36. That the system, as it existed in England, even before the statute of Elizabeth, formed no part of the original common law, and that it was a graft from the civil law, introduced by the ecclesiastics at some early and indefinite period in the history of the realm, is conceded in the opinion delivered in the Williams case (4 Seld., 542). Every student of English history is familiar with the struggle, beginning far back among the centuries, and running through many generations, between the commons of England and the ecclesiastics, under the lead and patronage of clerical chancellors. The doctrine taught by professional sectarians was, that the highest interest on earth was that of the church. Their most intimate communion with laymen was on those occasions, when sickness and infirmity made the latter an easy prey to cupidity in the guise of religion. In the name of charity munificent gifts were obtained from the credulous, the timid and the ignorant, all tending to the secular aggrandizement of the church, until a vast portion of the wealth of England was withdrawn from the general uses of society. Restraining laws were enacted from parliament to parliament; guaranties were exacted in royal charters; the aid of the common law courts was invoked to cleave down abuse after abuse; but the devices of priestly craft, aided by the subtlety of professional skill and the favor of encroaching chancellors, enabled the ecclesiastics to accomplish by indirection and evasion those ends which it was the constant purpose of the statutes to defeat. The usurpations of unscrupulous equity judges were appealed to as precedents, when better men succeeded to their places on the woolsack, and acquiescence in old abuses was recognized as authority for their continuance, if not their extension. The merit of each particular case was used as a makeweight in aid of the maintenance of a jurisdiction originally usurped without law. The chancery powers thus exercised in effectuating gifts to the uses of

charity, were referred to the prerogative of the crown and the favorite theory of the *cy pres*, a term so flexible in its import, and susceptible of such a variety of legal definitions, that it could always be plausibly invoked in aid of doubtful jurisdiction.

The legislature of 1788 had before it the statute of Elizabeth which it proposed to repeal. The appellants claim that this statute was but a digest of the preëxisting rules applicable to charitable uses. A parliamentary digest which changes the antecedent law, and which recites abuses demanding the change, is more than a mere digest. It is, in its nature, fundamental and organic. We think it should more properly be regarded as a codification of the English law on this subject. It gave to certain enumerated charities the sanction of legislative authority, and it left all not thus sanctioned to perish. As the Court of Appeals of Virginia said, in commenting upon the effect of the change: " The broad and comprehensive language of this statute gives reason to believe that, if there was any common law doctrine about indefinite charities, that doctrine was completely covered by the provisions of the statute. For, it was not a mere act organizing an inquisitorial commission, but its provisions were construed, and rightly construed, to give validity to charitable bequests, which were held void at the common law." (1 Ch. Cases, 134, 195; Hobart, 196; Finch, 221; Ch. Cas., 267; *Galleygo's Executors* v. *Attorney-General*, 3 Leigh, 474.)

The statute of Elizabeth, by declaring the validity of certain specific charities, brought those so legalized within the ordinary jurisdiction of courts of equity, in the enforcement of valid trusts; and the inquiry as to the preëxisting rules in equity on this subject is, therefore, of little practical importance. The investigations into the antecedent state of the law in England have been fruitful in cases, but barren in result.

The whole doctrine of uses was uncertain and obscure when the statute of 43 Elizabeth was framed. The year before it was adopted, Lord BACON introduced his celebrated

lecture on the statute of uses, before the Society of Gray's Inn, with these words: "I have chosen to read upon the statute of uses, made 27 Henry VIII — a law whereupon the inheritances of this realm are tossed at this day, like a ship upon the sea, in such sort that it is hard to say which bark will sink, and which will get to the haven; that is to say, what assurances will stand good, and what will not. Neither is this any lack or default in the pilots, the grave and learned judges; but the tides and currents of received errors, and unwarranted and abusive experience, have been so strong, as they were not able to keep a right course according to law." (1 Bacon's Works, Lond. ed., 1838.)

We have abundant evidence that these observations are peculiarly pertinent to the doctrine of charitable uses. The inquiry as to them is complicated by the additional difficulty of determining how far the powers exercised by the courts of equity were referable to prerogative and *cy pres*. The result of unwearied and exhaustive research has only been to widen the diversity of judicial and professional opinion.

The sources of information now mainly relied on by those who maintain the original jurisdiction of chancery in cases of charity, were not accessible to the legislature of 1788, and cannot be supposed to have influenced their action. It is scarcely probable that the more recent developments, if seasonably made, would have been more satisfactory to them than they have proved to the judicial tribunals. They led the majority of this court to one conclusion in the case of *Williams* v. *Williams*, and to an opposite conclusion in the subsequent case of *Owens* v. *The Missionary Society*. The Supreme Court of the United States held, in the case of the *Baptist Association* v. *Hart's Executors*, that chancery had no such inherent jurisdiction prior to the statute of Elizabeth. (4 Wheat., 1.) The *dicta* of Judge STORY in the Girard will case indicate that he had serious difficulty on the question, and that he inclined to a different opinion. (2 How. U. S., 192.) That the court did not share his doubts, is shown by the reaffirmance of the conclusion of Chief Justice MARSHALL by his successor in office, in the case of

*Fontain* v. *Ravenel*, decided since the judgment in the Williams case. (17 How. U. S., 388.)

A similar diversity has prevailed to some extent in the English courts; but the better opinion seems to have been, that such jurisdiction as chancery exercised prior to the statute of Elizabeth in cases of charity, was deduced from the royal prerogative; and such as it exercised afterward was in effectuating gifts, which in that statute received the specific sanction of the legislative department of the government. Such was the conclusion of Judge Wright in the Yates and the Levy cases; of Judge Davies in the Downing case; of Judge Selden in the Owen case; of Chief Justice Marshall in the case of the Baptist Association, and of Chief Justice Taney and Judge McLean in the case of *Fontain* v. *Ravenel;* and in that conclusion they were fortified by the highest judicial authorities in England. (9 Barb., 338, 339; 4 Kern., 380; 23 How., 4; 4 Wheat., 1; 17 How. U. S., 369; 3 Sandf., 351; 3 Vesey, 714; Hobart, 136; 2 Black. Com., 374; Shepard's Touchstone, 589; Saunders on Uses, 58, 389; Lewin on Trusts, 105; 1 Vernon, 226; 2 id., 387; 9 Vesey, 320, 400; 7 Simons, 352; 1 Turner & Russell, 260; 1 Mylne & Craig, 286; 2 Story's Eq. Jurisp.; §§ 1142–1144.)

It is clear, then, that the legislature of 1788 had a right to assume that irrespective of prerogative and *cy pres* powers, to which the courts of equity of this State have no claim, the system of charitable uses then existing in England rested on the authority of the statute of 43 Elizabeth. That the system, in the modified form in which it had thus been sanctioned by the English parliament, was fraught with infinite mischief and abuse, was not only matter of familiar public history, but was set forth in the preamble of the mortmain act of 9 George II, which was adopted in 1734; and which furnished emphatic evidence of the pernicious tendency of such uses under the statute of Elizabeth, as attested by the experience of the intervening century. The first clause of the act is in these words: "Whereas gifts or alienations of lands, tenements or hereditaments in mortmain, are prohibited or restrained by *Magna Charta* and divers other

wholesome laws as prejudicial to and against the common utility; *nevertheless, this public mischief has of late greatly increased* by many large and improvident alienations or dispositions made by languishing or dying persons, or by other persons, to uses called charitable uses, to take place after their deaths, to the disherison of their lawful heirs; for remedy whereof be it enacted," &c. (6 Statutes at Large, 246.)

The legislature of this State could not fail to see that the earlier English system of charity, which was superseded and displaced by the statute of Elizabeth, was fragmentary and disjointed; that it was obscure in its origin, incongruous in its theory, and disastrous in its tendency; that it had been discarded as an excrescence upon the common law, inappropriate even to a government in which the crown and the mitre were in mutual alliance and dependence; and that it would be still more unsuited to a commonwealth, in which by the fundamental law every religion is free, and ecclesiastics, of whatever creed, are subject to no restraint except those imposed by general legislation. They were engaged in founding institutions appropriate to a free state, and in cutting loose from such as had proved, in the mother country, beneficial to class interests, but hindrances to the prosperity of the general mass of the community. They had been warned by the experience of their ancestors that the free alienability of property is as essential to the healthful condition of a State as the flowing of the tides to the purity of, the sea, or the circulation of the blood to animal life.

They found a system of charities existing in England, aggressive and pernicious in its tendencies, and condemned by parliament in the successive laws by which it was restrained. They applied the appropriate remedy, by a simultaneous appeal of the enabling and restraining acts; which, with the aid of *cy pres* and prerogative, constituted the charity code of the realm. By this inchoate act of the State government a new policy was inaugurated. It was not merely the rescission of certain British statutes. It was the abrogation of a system which had been tried and condemned. It was not the revival of a more ancient and odious system,

but a casting off of the English law of charitable uses, as an unseemly outgrowth of ecclesiastic innovation and abuse. In that direction our earlier statesmen took no backward steps.

Such was held to be the effect of a similar repeal of the same statutes in Virginia. In delivering the unanimous opinion of the Court of Appeals of that State, Judge Tucker said: "If there were any recognized charities of an indefinite character at common law, the broad language of the statute of Elizabeth comprehended them. In so far as it did comprehend them, it reduced only to the form of a statute what was law before the statute; and our legislature in repealing it must be regarded as having repealed, not its mere naked words, but the principle which they involved. Although, therefore, it should be admitted that certain indefinite charities were recognized at the common law, yet, as the statute also comprehended them, and was itself repealed, the common law was repealed *eadem flatu* with the statute. (*Galleygo's Executors* v. *Attorney-General,* 3 Leigh, 476.)

The leading case in this country on the subject of indefinite charitable uses was that of the *Baptist Association* v. *Hart's Executors,* decided in 1819. (4 Wheat., 1.) The cause was argued by the ablest counsel of the time; the examination of authorities was exhaustive, and the judgment of the court was unanimous. Several passages in the opinion of Chief Justice Marshall are pertinent to the questions now under consideration. In speaking of the effect of subsequent legislation in England, on the jurisdiction exercised by the courts under the statutes of Elizabeth, he said: "The statute of George II has been uniformly construed to repeal in part the statute of Elizabeth; and charitable devises, comprehended in that act, have, ever since its passage, been declared void." He quotes, as evidence of the antecedent state of the law, the declaration of the lord chancellor in 3 Vesey, 725, that, anterior to the passage of the statute of wills, it does not appear that the Court of Chancery "had cognizance upon information for the establishment of charities. Prior to the time of Lord Ellsmere, as far as tradition in times immediately following goes,

there were no such informations as this on which I am now sitting, but they made out the case as well as they could by law." He demonstrates the fact, by reference to the English authorities, that such jurisdiction as that court exercised before the statute of Elizabeth " does not belong to the Court of Chancery, as a court of equity, but as administering the prerogatives and duties of the crown." He subsequently adds : " We now find this prerogative employed in enforcing donations to *charitable* uses, which would not be valid if made to *other* uses; in applying them to different objects than those designated by the donor; and in supplying all defects in the instrument by which the donation is conveyed, or in that by which it is administered. It is not to be admitted that legacies, not valid in themselves, can be made so by force of prerogative, in violation of private rights." In concluding his observations on the English chancery decisions, he says: " Although many of the cases go, perhaps, too far, yet, on a review of the authorities, we think they are to be considered as constructions of the statute not entirely to be justified, rather than as proving the existence of some other principle concealed in a dark and remote antiquity, and giving a rule, in cases of charity, which forms an exception to the general principles of our law. But even if, in England, the power of the king as *parens patriæ* would, independent of the statute, extend to a case of this description, the inquiry would still remain, how far this principle would govern in the courts of the United States." (4 Wheat., 49.) It is not necessary to add that these views are in direct antagonism to those advanced in the Williams case.

It is worthy of note that, when our legislature repealed the statute of charitable uses and the mortmain act, it reënacted the statute of wills, with the precise exception contained in the English law against devises to corporations. Nothing could be more significant as to the policy intended to be inaugurated in regard to charities, and which has been steadily adhered to by the legislature, as well prior as subsequent to the Williams case. Indefinite uses were abolished. Charities were to be administered here, under the authority

of law and subject to legislative regulation and control. As corporate agencies were contemplated, and as we had no corporations by prescription, we needed no mortmain act, for the restrictions upon each corporation would be embodied in the charter creating it. The exception in the statute of wills was appropriate to the system we proposed to adopt; and accordingly devises to corporations were not sanctioned by the general law, unless authority was specially conferred by legislation on the corporate body.

In the case of *McCartee* v. *The Orphan Asylum*, it was claimed that, under the English law of charitable uses, such a devise, if void at law, could be upheld in equity. The Court of Errors held otherwise, and reversed the decree of Chancellor JONES, by which such a devise had been upheld. (9 Cow., 437.) In this case, which was decided in 1827, on the eve of the revision of our statutes, the whole doctrine of charitable uses and trusts was elaborately discussed.

The judgment in that case was followed in 1830 by the adoption of those statutory provisions, which, until the decision in the Williams case, were generally supposed to have finally uprooted the English system, if it could be said to have ever obtained a lodgment here. In the article of the Revised Statutes entitled, " Of uses and trusts," the first section declares that " uses and trusts, except as authorized and modified in this article, are abolished." (1 R. S., 728.) This article occurs in the chapter relating to real property, and is, therefore, inapplicable in this, as it was also in the Williams case; but it was held, in the opinion in that case, that this provision, though in terms embracing all uses and trusts in lands, should be deemed to exclude charitable uses and trusts in such lands. The Supreme Court, in the case of *Yates* v. *Yates*, had held the precise converse of that proposition; and the doctrine of that case has been reaffirmed in this court since the decision of *Williams* v. *Williams*. (9 Barb., 324; 23 N. Y., 366.)

The article of the Revised Statutes, entitled, " Of the creation and division of estates," provided, that " every future estate shall be void in its creation, which shall suspend

the absolute power of alienation for a longer period than is prescribed in this article;" and it also provided that "the absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate," except in a single case, not relevant to the question under consideration. (1 R. S., 728.) It was maintained, in the opinion in the Williams case, that these provisions are inapplicable, where the power of alienation is suspended by a limitation to charitable uses; though this view seems to have been qualified, when the case of *Leonard* v. *Burr* was decided. (18 N. Y., 107, 108.)

The article of the Revised Statutes entitled, "Of accumulations of personal property and of expectant estates in such property," provides in the first section as follows: "The absolute ownership of personal property shall not be suspended by any condition or limitation whatever for a longer period than during the continuance and until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition; or, if such instrument be a will, for not more than two lives in being at the death of the testator." The fourth section of the same article provides that "all directions for the accumulation of the interest, income or profit of personal property, other than such as are herein allowed, shall be void." (1 R. S., 773, 774.) It was held in the Williams case, that bequests for charitable uses, though within the terms of both sections, were not within the intent of the first, but were within that of the last.

In considering the force and effect of that decision, it will be convenient to make a brief reference to some of the earlier cases in this State.

In the case of *Shotwell* v. *Mott*, Vice-Chancellor SANDFORD expressed opinions on the general questions involved, in harmony with the subsequent judgment in the Williams case; but they were overruled in the meantime by other authoritative decisions. (2 Sandf. Ch., 46.)

These questions were very fully considered in the Superior

TIFFANY— VOL. VII.      77

Court of the city of New York, in the case of *Ayres* v. *The Methodist Church*. (3 Sandf. S. C., 351.) The opinion was delivered by Judge DUER, one of the revisers, who, upon very elaborate examination, arrived at the following conclusions : 1. That the repeal of the statute of Elizabeth by the legislature of 1788 abrogated in this State the English law of charitable uses. 2. That if the English law on that subject was ever in force here, it was abolished by the Revised Statutes in the provisions above referred to. In a subsequent case, the correctness of the views then advanced by Judge DUER was demonstrated with great clearness and force of argument by the present Chief Judge of this court. (23 How., 4.)

Similar conclusions were reached by the Supreme Court in the leading case of *Yates* v. *Yates* (9 Barb., 324, 338, 339, 341). The unanimous opinion of the court on that occasion, which was delivered by Mr. Justice WRIGHT, was one of great ability and learning ; and though its authority was questioned in the Williams case, its correctness was subsequently reaffirmed by this court in the case of *Downing* v. *Marshall*. (23 N. Y., 366.)

Since the decision in the Williams case, the Supreme Court of the United States has had occasion to cite and approve the doctrines announced by Judge WRIGHT in the Yates case. (*Fontain* v. *Ravenel*, 17 How. U. S., 389.) Some of the same questions were there reëxamined in the opinion delivered by Chief Justice TANEY. He conceded that the testamentary gift then in question, which he held it to be the duty of the court to condemn, would have been sustained under the English law, and that the fund would have been applied to charitable uses, according to a scheme approved by the chancellor, or authorized under the sign manual of the king. " But," he added, " the power which the chancellor exercises over donations to charitable uses, so far as it differs from the power he exercises in other cases of trust, *does not belong to the Court of Chancery as a court of equity*, nor is it a part of its *judicial* power and jurisdiction. It is a branch of the prerogative power of the king as *parens*

*patriæ*, which he exercises by the chancellor." After review-
ing the authorities, he adds: "Resting my opinion upon the
English authorities above referred to, and upon the emphatic
language just quoted from the decision of this court, I think
I may safely conclude that the power exercised by the Eng-
lish Court of Chancery, in enforcing donations to *charitable*
uses, which would not be valid if made to *other* uses, is not
a part of its jurisdiction as a court of equity, but a preroga-
tive power exercised by that court." In alluding to the not
unusual error of assuming that the prerogative power, under
our system, vests in the courts without legislative grant, he
says: "These prerogative powers which belong to the sov-
ereign, as *parens patriæ*, remain with the States. They may
*legalize* charitable bequests within their own respective
dominions, to the extent to which the law upon that subject
has been carried in England; and they may *require* any tri-
bunal of the State, which they select for that purpose, to
establish such charities and to carry them into execution."
After adverting to the fact that the investigations of the
record commission had furnished evidence of the early exer-
cise, by the equity tribunals, of powers akin to those asserted
under the statute of Elizabeth, he adds: "But this circum-
stance does not affect the question I am now considering;
for, whether exercised before or not, yet whenever exercised,
it was in virtue of the prerogative power, and not as a part
of the jurisdiction of the court as a court of equity." A
subsequent passage in the opinion is specially pertinent to
the question, as to the effect of the action of the legislature
of 1788 in repealing the statute of Elizabeth. "Besides,"
he says, "if it could be shown that, at some remote period of
time, the Court of Chancery exercised this power as a part
of its ordinary jurisdiction as a court of equity, it would
not influence the construction of the words used in the Con-
stitution. For at the time that instrument was adopted, it
was *universally admitted* by the jurists in England and in
this country, as will appear by the references above made,
that this extraordinary and unregulated power in relation to

charities *was not judicial*, and did not belong to the court as a court of equity." (17 How. U. S., 394.)

We have felt it due to the importance of a question as to overruling a former decision of this court, to present this general view of the state of the law antecedent to that decision; and it is not less important to advert to the course of our State legislation on the general subject of gifts for charitable purposes.

Prior to the reversal of the judgment of the Supreme Court in the Williams case, it had been the settled policy of this State to encourage benefactions by the living, rather than posthumous beneficence; and in regard to charities of either class, it had favored donations to legally organized societies, and not to mere trustees with private endowments. In respect to gifts to charity *in presenti*, the law had imposed no restraints, except those demanded in justice to creditors, where donations might operate in fraud of their legal claims; but in regard to posthumous gifts, it had imposed salutary limitations, by prohibiting devises even to charitable institutions, unless specially authorized by law to take. (2 R. S., 57, § 3; 2 Edm., 58.) It had introduced specific restrictions in all its charters to corporations organized for the advancement of learning or the purposes of general charity. It had reaffirmed the same policy in the general statute for the incorporation of benevolent and charitable associations, by forbidding testamentary gifts in their favor, unless the will containing them be executed at least two months before the death of the donor. It had precluded the acceptance of any posthumous gift, the clear income of which should be more than $10,000 a year. It had prohibited any devise or bequest in their favor exceeding one-fourth of the testator's estate, if he left either wife, parent or child. It had required the trustees of all such societies to make sworn annual statements of their assets and liabilities, and to put them on file in the offices of the county clerks, where they would be at all times accessible to the public; and it had subjected the institutions thus organized to visitation and inspection by

the justices of the Supreme Court, and their appointees. (Laws of 1848, ch. 319 ; 3 Edm., 707.)

Under this system of State policy, charitable institutions without number had been organized under the authority of law, inviting the benefactions of wealth in every department of enlightened and christian benevolence, and provided with ample and effective agencies for applying the contributions of the living, and the funds received from the estates of the dead, to the beneficent ends they were designed to promote. As new schemes of bounty from time to time were devised, new societies were organized to carry them into effect. The system was symmetrical, harmonious and complete. It was adapted to our political condition. It needed no aid from royal prerogative, none from the statute books of England, none from " the unreported jurisprudence of former ages," none from the loose and vague uncertainty of the dangerous doctrine of *cy pres.* It required the interpolation of no unwritten exceptions in the comprehensive language of our general laws. It was in unison with our statutes defining and limiting uses and trusts, forbidding the withdrawal of property from the uses of society for the purpose of indefinite and unauthorized accumulation, and prohibiting the creation of perpetuities by mere individual caprice, without the sanction of legislative authority. It was in harmony with the framework of our institutions and with all our antecedent legislation. It was eminently conducive to the attainment of the noble objects these charities are designed to promote, and it tended to keep safe and inviolate the funds dedicated to the amelioration of the condition of our race.

Such was the settled policy of the State, when the case of *Williams* v. *Williams* was decided. That decision tended to inaugurate a very different policy. It assumed that the founders of our State government were unaware of their own ancestral history, and of the intolerable abuses which, under the nurture of clerical chancellors, grew up in the name of charity to be cut down by the successive mortmain acts ; and that they deliberately intended, when they repealed at once the statute of Elizabeth and the mortmain acts, not to displace

the English system of indefinite charitable uses, but merely to sweep away the restraints, which alone rendered it endurable even under a monarchy.

That decision was made on the theory, that while our earlier statesmen were rejecting with enlightened discrimination those of the British statutes which were not adapted to our political condition, they seriously intended to embody in our system of jurisprudence the most odious feature in the ancient laws of England — the doctrine of charitable uses as it existed before it was mitigated by the restraining acts. It is to be borne in mind, that the question is not, what jurisdiction had been exercised by the English Court of Chancery in respect to charities, prior to the statute of Elizabeth; for that was a jurisdiction enlarged by prerogative and *cy pres* powers, with which the courts of this State have not been invested. The material and practical inquiry is as to the intent and effect of the unconditional repeal in this State of the English statute of charitable uses, with the mortmain acts in restraint of such uses. On that question, it seems to have been assumed in the Williams case, that the purpose of the legislature of 1788 was to reinaugurate here an ancient and obsolete system, freed from all the salutary restraints of modern English legislation; or, perhaps more properly, that the members of that enlightened body, through heedless incaution, circumvented their own intent, and exhumed to new life in a free State the buried abuses of the old English Court of Chancery, by repealing the mortmain acts and the statute of Elizabeth, which had shorn that court of the unlimited powers it had usurped from time to time, in periods of sectarian strife and of intestine and foreign wars.

It was held by the Supreme Court, in the *Yates Case*, that indefinite charitable uses and trusts, if ever lawful in this State, were prohibited by the Revised Statutes; but it was held in the Williams case, that such uses and trusts, though within the words of the statutes, could not be deemed within their operation or intent, on the ground that they were not specifically named, and that the legislature could not have intended to embrace them in provisions purporting to apply

in general terms to all uses and trusts; and so of the corresponding provisions against the unauthorized suspension of the ownership of personal property.

If it be true that charitable uses and trusts were not intended to be embraced in the broad and comprehensive language of these statutes, the omission to except them from the general terms of the prohibition would be inexplicable on any other theory, than that Benjamin F. Butler, John Duer and John C. Spencer, the commissioners charged with the duty of revision, were unmindful of an important branch of the law, with which professional labor and research had made them probably more familiar than any other three gentlemen who could have been selected among the leading jurists of their day; and who were dealing with a question on which the experience of centuries had poured its light. The statutory provisions they introduced were essentially organic. Their design was to limit the bounds within which trusts might be created, and to prohibit all perpetuities unauthorized by law, and deriving their sole sanction from individual will. The question was considered in the Williams case, where the alternative presented was, whether the statute should bend to the bequest, or the bequest bend to the statute; and the practical effect of the ruling was, that the statute was made to bend, by holding that, for this purpose, a trust for a charitable use is neither a use nor a trust.

This doctrine, if it can be upheld, would render practically nugatory the restraints which the law has imposed upon testators, and the restrictions inserted by the legislature in special charters, and in general laws for the incorporation of charitable societies. Its effect is to divert donations from institutions, incorporated for purposes of philanthropic and christian benevolence, and to invite evasion of State regulation and avoidance of public scrutiny, by tendering to every private citizen the right to create a perpetuity for such purpose as to him may seem good, and to endue it with more than corporate powers and more than corporate immunity. It holds out to every testator the assurance that though he cannot withdraw his property from the operation of general

laws by gifts to societies organized under State authority, which would vest at once in the donees for purposes of charity, he can thus withdraw it from statutory regulation and restrictions, by giving the legal title to trustees of his own appointment, and that he can exercise over the so-called charity and the trustees in perpetual succession, the authority of a supreme legislator, unrestrained by the general statutes regulating the creation and division of estates, limiting uses and trusts, and forbidding perpetuities unauthorized by law. It assures him that though he is prohibited by statute from making an effectual bequest to a chartered charitable society, unless the will containing it be executed at least two months before his decease, he may make it to a private trustee for like purposes on the day of his death; that though he is precluded from making to any existing charitable institution a posthumous donation yielding an income of over ten thousand dollars a year, he may by will create a private institution, bearing his name and free from visitation or inspection; and bestow an endowment yielding an income of ten times that amount; that though he may not, if he has wife, parent or child, give more than one-quarter or one-half of his estate to any charitable organization sanctioned by law, he may give the whole to a charity which has no sanction but his own.

It is said that the authority of *Williams* v. *Williams* has never been questioned. It certainly has not received the sanction of the law-making power. On the contrary, it is quite manifest, from the action of the legislature since the decision was announced, that the views of that department of the government, as to the state of the law and the policy on which it is founded, have undergone no change. One of the marked instances in which public attention was drawn to this question, was on the occasion of the adoption of the recent "Act relating to wills." (Laws of 1860, ch. 360; 4 Edm., 504.) The purpose of the law is not only expressed in its title, but apparent upon its face. It was designed to regulate and restrict the power of testators. It was neither conceived nor framed in a spirit of hostility to charitable

societies. On the contrary, it enlarged the proportion of a testator's estate which he might dedicate to charitable uses, in exclusion of the claims of his own immediate family. The legislature assumed the law to be, as it had been settled in the Yates case, and upon that assumption, it prohibited the gift to any charitable "society, association or corporation," by any testator embraced in the terms of the provision, of more than half his estate. If that body had supposed the law to be, that a testator could evade the intent and elude the effect of the prohibition, by giving the whole of his property to a private trustee of his own selection, for the same precise benevolent object, the enactment would have been so shaped as effectually to meet the mischief it was expressly designed to remedy.

If the claim that the doctrine of the Williams case has never been questioned, is based merely on the fact that no appeal was taken from the decision, it imports only that, as it was pronounced by a tribunal from which there was no appeal, it was conclusive in the particular case, whether it did or did not operate to change the general law and to annul the force of existing statutes. In this respect it differed from the Yates case, in which the acquiescence in the judgment was voluntary, though the rights in a great estate were involved, and though the counsel, by whom in that memorable cause the respective parties were represented, had no recognized superiors at the American bar.

The Williams case was one which itself questioned the law as previously settled in this State, not merely by legislative action, but by a deliberate judgment of the Supreme Court, in a great and leading case, which had been acquiesced in by the parties, approved by the great body of the profession, and accepted by the public at large as a permanent rule of property.

Indeed, there has been no period when the decision in the Williams case has been unquestioned, since the day it was announced. It purported to exclude a large and important class of uses and trusts from the operation of a general statute, which it conceded to be sufficiently comprehensive

in the generality of its words to embrace all uses and trusts. The eminent jurist by whom the opinion of the court was pronounced, discussed with almost unrivaled ability the various questions involved; and though his power of argument and earnestness of conviction, on that, as on all occasions, commanded universal respect, they did not secure the unanimous concurrence of his distinguished associates on the bench. Judges ALEXANDER S. JOHNSON, GARDINER and TAGGART dissented from the opinion and the judgment. (4 Seld., 558.) It is a striking fact, that on a question of such vital importance, and which has been examined and determined by more of the judges of the State than almost any other forensic issue of the time, the decision was adverse to the view, sanctioned by an almost overwhelming preponderance of judicial authority; and while it attests the commanding ability of the opinion which controlled the vote of a majority of the court, it gives additional weight to the consideration that it was the opinion of a divided bench. It is true that no occasion has hitherto arisen in which it became necessary directly to overrule the decision in that case; but the grounds on which it rested have been, one after another, swept away by the subsequent judgments of this court.

The fundamental proposition in the opinion was, "that the law of charitable uses, as it existed in England at the time of the revolution, and the jurisdiction of the Court of Chancery over these subjects, became the law of this State on the adoption of the Constitution of 1777; that the law has not been repealed, and that the existing courts of the State having equity jurisdiction are bound to administer that law." The acquiescence of four of the other judges in this proposition led to the judgment of reversal. (4 Seld., 525, 558.) In the case of *Owens* v. *The Missionary Society*, the question was reëxamined by Judge SELDEN in an opinion of conspicuous ability, and he arrived on the main question at a directly opposite conclusion. In that conclusion a majority of the court concurred. Judge DENIO expressed his dissent from the views of his brethren, on the authority

of the Williams case, but on another ground concurred in the judgment pronounced by the court. (14 N. Y., 380.)

The other principal ground on which the decision in the Williams case was based, was, that " the provisions of the Revised Statutes respecting trusts, perpetuities and the limitations of future estates," respectively, " were not designed to, and do not, at all affect conveyances or testamentary gifts to religious or charitable corporations." (4 Seld., 537.) This proposition was maintained on the authority of English decisions, which, it was claimed, gave countenance to the idea that charitable trusts were not within the operation of general statutes, unless specifically named. That such is not the law of England, has since been unanimously adjudged in the House of Lords, in the case of *Oxford College* v. *The Attorney-General*, in accordance with the previous decision of Sir EDWARD SUGDEN, as Lord Chancellor of Ireland, in the case of the *Commissioners of Charitable Donations* v. *Wybrandts*. (6 House of Lords Cases, 208; 2 Jones & La Touche, 182.) The question arose in the House of Lords, under the statutes 3 and 4 William IV., c. 27, and Lord Chancellor CRANWORTH said: " What has been the effect of the late statute? Are charities within those two sections, 24 and 25, or are they not? I have come to the conclusion that they are. These sections apply in terms to all trusts. Charities are trusts; a favored sort of trusts, no doubt, but still a charity is a trust, and nothing more. Lord ST. LEONARDS remarked truly, that charities, *eo nomine*, are not mentioned in the statute, and expressed his surprise that the omission had occurred; but that is not material, for trusts generally are mentioned, and that *includes* charitable trusts, unless they are *expressly excepted*, and there certainly is no such exception."

The decision in the Williams case that, in the title of the statutes, " Of accumulations of personal property, and of expectant estates in such property," the general words of the first two sections do not embrace charities, was coupled with the admission that the like general words of the succeeding sections do. (4 Seld., 538.) That the decision was right in holding that charities, though not specifically named, are within

the operation of the latter sections, has since been affirmed in the case of *Phelps* v. *Pond* (23 N. Y., 69, 77, 80.) That it was erroneous in holding that the first two sections do not apply to charities, has since been adjudged in the Rose will case, where the bequest to charitable uses was condemned under the provisions of those two sections. That it was wrong in holding that trusts for charity are not within the statute prohibiting perpetuities in lands, was expressly decided in the case of *Beekman* v. *Bonsor ;* and Judges DENIO and MASON dissented from the opinion of Judge COMSTOCK, on the ground that his views on this point, which were adopted by the court, were in conflict with the rulings in the Williams case. (23 N. Y., 315, 318.)

The reëxamination of the rulings in that case on the principal question involved, has led us to the clear conclusion, that in the light of antecedent and subsequent decisions, they cannot be upheld without subverting what we believe to be the law. We think the English system of indefinite charitable uses, if it ever existed in this State, fell with the repeal of the statute of Elizabeth and the mortmain acts ; and we are also of opinion that gifts of this nature are within the scope and meaning, as well as the terms, of our statutes, forbidding perpetuities unauthorized by law.

It seems to be assumed by the advocates of an opposite theory, that those who approve the doctrines settled in this State, in *Yates* v. *Yates*, and sustained in the federal courts, and who disapprove of the innovation in *Williams* v. *Williams*, are animated by a spirit of hostility to gifts for purposes of charity. There is no warrant for such an assumption. Testamentary donations for meritorious objects, and within the limits prescribed by law, are universally favored ; and the diversity of judicial opinion, which to some extent has prevailed on this subject, has been only as to the legal and appropriate mode of effectuating the charitable intent. Those opposed to the innovation believe it to be the law of this State, as it certainly has been its policy, that funds irrevocably dedicated to purposes of charity, are to be administered through agencies and organizations sanctioned

by legislative authority, and not by the intervention of private trustees, deriving perpetual succession through the will of a testator, and claiming immunity from the operation of general laws. The noble charities which have grown up in our midst under the system of State recognition, and the boundless benefactions which have thus been diffused, through organized and responsible agencies, sufficiently vindicate that policy, and those who uphold it, from the imputation of hostility to public charities.

The judgment of the Supreme Court should be affirmed.

The opinion of PORTER, J., was concurred in by DAVIES, Ch. J., and by WRIGHT, LEONARD, PECKHAM, MORGAN and SMITH, JJ.

HUNT, J., read an opinion dissenting from the overruling of the decision in *Williams* v. *Williams*, but holding that the bequests failed, from the non-existence of a sufficient trustee in whom the gifts might vest.

Judgment affirmed.