THE RECTOR, ETC., OF THE CHURCH OF THE REDEMPTION, APPELLANT, *v.* THE RECTOR, ETC., OF GRACE CHURCH, RESPONDENT.

*Act of* 1813 — *unincorporated religious society* — *trusts for benefit of* — *chap.* 122 *of* 1850 — *property held by corporation in trust under* — *when title of, divested,*

The provisions of the act of 1813, providing for the incorporation of religious societies, authorizing property, both real and personal, to be held in trust for an unincorporated religious society, were not affected by the Revised Statutes and are still in force.

It is not necessary that the deed should show that the property is held in trust for the society, nor does the statute require written evidence of the fact; it may be proved, as other facts, by any pertinent evidence.

By virtue of that act all property, held by natural persons in trust for any unincorporated religious society, vests in such society immediately upon its incorporation.

But where property is acquired and held by a religious corporation in trust for an unincorporated society or congregation, in accordance with the provisions of chapter 122 of 1850, its title thereto is not divested by the incorporation of such society or congregation, unless that be done with the consent of the vestry or trustees of the corporation holding the legal and formal title to the property.

It is the consent of the vestry as a body, not that of the individual members thereof, which the act requires.

The act of 1850 confers the power, of holding property in trust for an unincorporated religious society or congregation, upon religious corporations formed under the general laws of the State, as the same existed before the act of 1813, as well as upon those afterwards incorporated under the provisions of the said act.

APPEAL from a judgment in favor of the defendant, entered upon the trial of this action at Special Term.

The action was brought by plaintiff to establish and have declared, its rights in and to the church building on the south side of Fourteenth street, between Third and Fourth avenues, in the city of New York, and also to certain personal property, consisting of carpets, an organ and other furniture in use in said church, of the use and enjoyment whereof the plaintiff had been wrongfully and unlawfully deprived by defendant.

During the pendency of the action the property was destroyed by fire, and the defendant having collected large amounts of insurance on the building and furniture, the facts were alleged, and the benefit thereof claimed by plaintiff by supplemental pleading.

*C. & C. E. Tracy,* for the appellant.

*Clarkson N. Potter,* for the respondent.

DANIELS, J.:

The plaintiff in this action claims to have been a religious corporation, existing in the city of New York since 1864. And the defendant has been a religious corporation of that city since 1809. Each claims title to a lot of land situated upon Fourteenth street, between Third and Fourth avenues, and the church edifice erected on it. The plaintiff was excluded from its possession and occupancy in the year 1868, by the defendant, and brought this action for the purpose of procuring an adjudication confirmatory of its title, and for a formal conveyance of it by the defendant. In 1859, the land was conveyed by deed to the defendant, and ever since then it has claimed to be the legal and equitable owner of the property, and, as such, entitled to exclude the plaintiff from its possession. The land was purchased and the title to it acquired for the purpose of erecting upon it a church edifice, to be used as an Episcopal free church. And it was so maintained from the completion of the edifice, in the year 1861, to the time of the incorporation of the plaintiff, in 1866, and substantially so until the time of the plaintiff's expulsion from it.

For several years before the land was acquired and the edifice erected upon it, a congregation had been collected together as a mission, or free church, of the defendant, which mission had, to a

considerable extent, been dependent upon defendant for support and fostering care. This congregation had occupied rented rooms or halls for its religious services, until it had acquired such size and proportions as to require more ample facilities in that respect. And for the purpose of meeting and providing for this necessity, the land in question was purchased, and a church edifice built upon it. The mission congregation and the defendant combined their efforts for the accomplishment of these results. The cost of the land was $21,500; of that amount the defendant paid $14,000, which it held for the maintenance of a free church, and the congregation raised, by voluntary contributions and subscriptions, the residue of $7,500. The cost of the church edifice built upon the land was $57,711.15; $15,000 of this amount was raised by a loan made upon a mortgage given by the defendant upon the property. About $17,000 of it was voluntarily contributed by members of the mission congregation, and others moved by their solicitations; and the residue of about $26,000 was paid by the defendant, and through its instrumentality.

The contributions secured from all sources appear to have been made for the purpose of building up a free church under the auspices and protection of the defendant. The appeals, so far as they were made by the rector and members of the congregation, were founded upon that profession, and the moneys were supplied to secure that object. During the time when the contributions were solicited and obtained, and also before the enterprise of procuring a site and erecting a church edifice was undertaken, the congregation was known and called: "Astor Place Mission," "Astor Place Congregation," " The Congregation of the Astor Place Protestant Episcopal Mission Church," and " Mission Chapel connected with Grace Church." And when it went into the possession of the church edifice it was called the " Free Church of the Redemption; " and inscribed over its principal entrance " Protestant Episcopal Free Church of the Redemption." That continued to be the name of the congregation until its alleged incorporation, when the name of " The Rector, Church Wardens and Vestrymen of the Church of the Redemption " was adopted. Under that name it has, for much of the time since, maintained its existence; and communications were received by the vestry of the defendant from its officers

in that name ; and it was referred to as the Church of the Redemption in proceedings taken by the defendant's vestry.

These are most of the leading and controlling facts established by the evidence given in this case, and under them the plaintiff claims that it could not be lawfully excluded from the use and enjoyment of this church property. This exclusion was really of the body corporate, and its adherents in the disagreement (which arose first in November, 1866, and continued until the defendant took possession in 1868), concerning the conduct and management of the society. Those opposed to the action of the corporate authorities, and the members of the congregation sustaining them, appealed to the defendant to interfere, by virtue of its proprietary title ; and it did so, in order to terminate dissensions which seemed incapable of amicable adjustment. And after that the free church service was resumed, and continued under its controlling authority.

The learned judge before whom the cause was tried, held that no valid trust could exist in the property while it was held by the defendant for the use of the congregation, and for that reason the plaintiff could acquire no interest in it by virtue of its incorporation. As a general legal proposition this was undoubtedly the law. For it has been held in several instances that a use or trust could not be lawfully created for the benefit of a mere voluntary unincorporated society or association. But as to religious societies that is not so clearly the law. They are exceptional in this respect by reason of an early provision made in their favor, contained in the laws providing for the organization and creation of religious corporations. By this provision a very clear implication was made in favor of the validity of such a use of property. It was the understanding of the legislature enacting the law, that property, both real and personal, could be lawfully held for the use of an unincorporated religious society, without any restriction as to time, except that the use should be terminated by its lawful incorporation. In that event, the trustees of every congregation or society previously mentioned, and which included the church wardens and vestrymen of Episcopal churches, who were previously designated as trustees, were " authorized and empowered to take into their possession and custody all the temporalities belonging to

such church, congregation or society, whether the same consist of real or personal estate, and whether the same shall have been given, granted or devised directly to such church, congregation or society, *or to any other person for their use;* and also by their corporate name or title, to sue and be sued in all courts of law or equity, and to recover, hold and enjoy all the debts, demands, rights and privileges, and all churches, meeting-houses, parsonages and burying-places, with the appurtenances, and all estates belonging to such church, congregation or society, in whatsoever manner the same may have been acquired, *or in whose name soever the same may be held,* as fully and amply as if the right or title thereto had originally been vested in the said trustees. (2 R. S. [5th ed.], 607, § 4; Revised Laws of 1801, vol. 1, 340, § 4; see, also, the proviso at the end of section 1, in which the vestry is designated as a board of trustees.)

If property could not lawfully be held in trust for the use of an unincorporated religious society or association, this provision authorizing and empowering the trustees, upon the incorporation, to take possession of such property, would be a meaningless absurdity. And that was clearly not the understanding of the legislature. What it designed was to provide for a state of things which might be found as lawfully existing at the time of the incorporation; and that was to act upon and terminate all such uses by vesting the title absolutely in the corporation. Without such a valid use, the trustees could not take possession of the property, and it would not have been within the scope of legislative power to confer that authority upon them. But with it, the property devoted to the use would equitably belong to the corporators, and could well be vested in the corporation as soon as it should be created. The statute was intended to transfer the title to all such property, because it could be held for the use of the society previous to its incorporation, and might be placed in the name of any person for that purpose. This use was protected and maintained until a corporate body should come into existence by the action of the society, in which the title could be absolutely vested, and then it was provided that a transfer of it by operation of law should at once take place.

That this was the construction required by the statute before the

revision which was made in 1830 will not probably be any where denied. And under the circumstances no good reason exists for concluding that any change was then intended to be made in it. It was not revised neither was it repealed by any direct action of the revisers or the legislature. But what was done with it was to continue it in force as it had previously existed, and that was not consistent with the theory that it should be changed or modified by mere implication. The alterations, which were then intended to be made, for the government of religious societies, were expressed and designated. But no interference was attempted with the provisions of the previous laws concerning religious societies and corporations. If any had been designed by the provisions made concerning trusts and future estates in real and personal property, something would undoubtedly have been expressed declaratory of the existence of that purpose. But nothing of that kind was at any time done. The laws concerning religious societies and corporations had matured into a useful and convenient code which it seems to have been supposed could not be materially improved by changing them. And the provisions providing generally for a different disposition and use of property were not apparently extended so far as to affect them.

Nothing better or more complete in their nature could well have been devised, and both the revisers and the legislature left them as they were. The system had worked well and had been free from abuse, and no reason appeared for abrogating it.

To this extent what might be called a charitable or religious use of property, appears to have been sanctioned by the written law of the State. And such was considered to be its effect by the courts that have been called upon to apply it. (*Baptist Church in Hartford* v. *Witherell*, 3 Paige, 296 ; *Dutch Church in Garden St.*, 7 id., 77 ; *Tucker* v. *Rector, etc., of St. Clement's Church*, 3 Sandf., 242, 251.) It has been urged that a different view has been maintained in the Court of Appeals. But neither *Williams* v. *Williams* (4 Seld., 525), *Bascom* v. *Albertson* (34 N. Y., 584), *Gram* v. *Prussia Lutheran Society* (36 id., 161), or *Levy* v. *Levy* (33 id., 97), or any other authority cited or found in which the point has been involved, will sanction that position as to property devoted by gift or grant to the use of an unincorporated religious society. The

statute sanctions that disposition of property only when it may be given or granted for the use of a religious congregation or society. To that extent alone it has been the purpose of the legislature to sustain the intended use. The enactment on this subject is in the nature of a special provision not liable to be repealed or changed by mere general legislation containing no reference whatever to it. (*Matter of Commrs. of Central Park*, 50 N. Y., 493; *Williams v. Williams*, 4 Seld., 532, 533.)

And by various amendments and alterations it has been treated by the legislature as all the while in force.

This provision of the revised laws did not render the right of the society to the property, after its incorporation, dependent on the fact that by the deed it should appear to be held for the use of the society. But the right was made to depend wholly on the fact of the property being held for the use of the congregation or society in its unincorporated state. When that proves to be the case, the statute acts upon the title and at once transfers it as soon as the corporation may be formed; and as the statute does not require written evidence of the existence of the fact, it follows that it can be proved, as facts ordinarily are, by any evidence pertinent for that purpose. (*Foote* v. *Bryant*, 47 N. Y., 544.)

In this case it clearly appeared, that the land was acquired and the church erected for the use of the Astor Place congregation. Its own committee superintended the building of the edifice, and had the active management of the business connected with it. And near the time of its completion the congregation took possession of the basement for its religious services, and afterward of the upper portions of the building as soon as it was in a proper condition for use. Near that time the defendant's rector preached in the new edifice, and admonished the congregation that it must depend upon its own resources from that time, without expecting further aid and assistance from the defendant; and it did so, and occupied the building and controlled its use, in all respects the same as it would be expected to do with property held solely for its occupancy and enjoyment. That continued without interruption or disturbance, until after the decease of the Rev. Mr. Dickson, who had been the rector employed by the defendant for the congregation, since the time when its numbers had increased so as to

require the continued services and attention of a clergyman. This occupancy and enjoyment of the property extended from the time of the completion of the church edifice in 1861, until the latter part of the year 1866, without the least question of the right of the congregation to it, or any objection whatever on the part of the defendant; but, on the other hand, it was attended with the apparent acquiescence and approval of the defendant during the whole of that period of time; and with the facts which transpired before the ground was purchased, the object for which the purchase was made, and the manner in which the building of the church edifice was superintended, clearly established the conclusion that the property was procured and held for the use and benefit of this congregation: and the unrestrained effect of the act of 1813 would have vested it in the corporation upon its formation, whenever that was regularly done, subject to the equities of the defendant for the reimbursement of any investments made by it, and not designed as donations to the Astor Place congregation.

But at the time when the property was procured, and when the corporation was claimed to have been formed by the members of the corporation, that act had been modified and restrained by further provisions, under which the defendant seems to have proceeded. One of these was contained in chapter 230 of the Laws of 1855, which, assuming the legality of uses in property for the benefit of religious congregations and societies, required the conveyance, devise or lease to be made to a corporation, and, when previously made to an individual, terminated his title with his decease. (Id., §§ 2, 3.) It is not important, however, to examine this act critically, because none of the provisions contained in it, were in the least transcended in the conveyance or use of this property, and the act itself was repealed before the incorporation of the plaintiff. (Chap. 147, Laws of 1862.)

This repeal would probably have fully restored the provision made by the act of 1813, for the investment of the title to property held for the use of the congregation in the corporation, upon its formation, were it not for another provision affecting the case, and still continued in force. That was, in the first instance, enacted in 1850, and was, undoubtedly, the principal, if not exclusive authority under which the defendant took its title to this property, and

which must be controlling in its effect upon the present controversy. (Laws of 1850, chap. 122, § 2.) It was amended, by making it more comprehensive, in 1860. (Laws of 1860, chap. 235.) But all that can be applicable to this case was contained in the law when it was first enacted. By that it was provided that, " whenever any religious corporation, incorporated under the ' act to provide for the incorporation of religious societies,' passed April 5, 1813, or by any special charter, shall deem it necessary or expedient, for the accommodation of its members, in consequence of their number or dispersed habitations, or otherwise, to increase the facilities for public worship, the vestry or trustees thereof may purchase and hold grounds in the same village, town or city, and may erect thereon suitable associate meeting-houses or churches or convenient chapels, or may hire, or purchase and hold any such grounds, with suitable buildings already erected thereon, for the like purpose, notwithstanding any restriction contained or supposed to be contained in the said act, or in any such charter, and the persons statedly worshipping in any such associate meeting-house or church, or in such chapel, may, with the consent of the vestry or trustees of said corporation, be separately organized and incorporated." (Laws of 1850, 196, § 2.)

By its terms this act conferred the power created by it only upon religious societies incorporated by special charter or under the act of 1813, which, upon the facts as they were found by the court, might nominally exclude the defendant were it not for the concessions made by the pleadings. The court found the incorporation of the defendant to have taken place under the law of this State for the incorporation of Episcopal churches, passed on the 27th of March, 1801, while the complaint alleged that the plaintiff was incorporated under the general laws of the State which, from subsequent allegations, was shown to have referred to the act of 1813; and it also averred that the defendant was organized by and under the same laws. This was not denied, but the defendant simply admitted its incorporation under the general laws of the State. By not denying the fact, as the plaintiff alleged it, the Code required that it should be taken as true for the purposes of the action (Code, § 168), and that, probably, would be sufficient to entitle the defendant to be considered a corporation formed under

the act of 1813 for all the purposes of section 2 of the act of 1850.

But it is not necessary that the case should be allowed to rest upon an advantage so narrowly secured by the defendant. A broader construction should be given to the act of 1850 than the literal import of the terms used in it, would seem to justify or require. That is rendered reasonably evident from the circumstance that the act of 1813 included the act of 1801 for the incorporation of religious societies, re-enacting and continuing it with additional sections. (1 Rev. Laws 1801, 336, chap. 79 ; 2 R. S. [5th ed.], 604–610.) From that time the act of 1801 was only in force by means of the act of 1813, of which it formed the most material part, and in a general sense it was consequently true that the religious corporations of the State existed in 1850 under the act of 1813, or by virtue of special charter, and the reference made in the section quoted from the act of 1850 therefore included religious corporations formed under the general law of the State before 1813, as well as those afterward incorporated by virtue of the provisions of the law of 1813. This construction is sustained by the further consideration that no reason whatever existed for distinguishing the churches incorporated under the act of 1801 from those acquiring like character after the enactment of the law of 1813. If it were advisable or proper that one class should have the power provided by section 2 of the act of 1850, it was equally so that it should be given to the others. No reason for any discrimination appears from the design or purposes of the act; but in its enactment the legislature undoubtedly considered that all would be alike included by the reference which it contained. That was the intent designed in part to be accomplished by the enactment; and the manner in which the act of 1813 was framed, as well as the language of one of its sections, re-enacted from the preceding law of 1801, justified the legislature in concluding that it could be fully secured by the reference contained in section 2 of the act of 1850. That language was, that every religious corporation of any church, congregation or religious society heretofore made in pursuance of any law of this State and in conformity to the directions contained in this act shall be, and the same is, hereby established and confirmed, and such corporation shall be deemed to

have commenced from the time of recording such certificate, etc. (Laws of 1801, vol. 1, 343, § 11; 2 R. S. [5th ed.], 610, § 13.) The provision is precisely the same in both these acts; and it was an adoption, by the act of 1813, of all the corporations previously formed by conforming to the requirements of the act of 1801.

The facts, proved by the evidence and found by the court as established, presented an emergency for the action of the defendant, which was very clearly within the scope and intent of the section quoted from the act of 1850. They showed that one of its parishioners, John W. Mitchell, with the aid and co-operation of its rector, the Reverend Doctor Taylor, opened a Sunday-school at the Seventh Day Baptist Church, on Eleventh street, in the year 1852, which soon succeeded in collecting together the parents of the children and others for religious worship. And the Reverend Robert G. Dickson was employed by the defendant for the purpose of conducting the services. This selection proved well adapted to the work to be performed, and the result was, the Astor Place congregation, for whose accommodation and convenience the church property in controversy was obtained, and the church edifice erected upon it. And all that, the defendant was empowered to do by the spirit of the provision contained in the act of 1850. Since then, the provision has been so far extended as to provide in terms for such Sunday-school enterprises, as proved to be the first step in the formation of the congregation brought together in part by its instrumentality. (Laws of 1860, chap. 235.) But in all other respects the original section has been allowed to remain unchanged.

The defendant found itself with a large congregation, formed under its auspices, and dependent upon its patronage and assistance. The persons composing it were substantially its members requiring increased facilities for public worship beyond those owned by it or hired for the new congregation. And to supply the necessity the land on Fourteenth street was procured, and the edifice built upon it by the co-operation of both the defendant and the active members of the mission congregation, including its rector. This was all within the very ample authority given for the purpose by the second section of the act of 1850. And it rendered the property subject to what was provided in it, so far as that modified the provision made for the disposition of church property, by the pre-

ceding acts of 1801 and 1813, held for the use of an unincorporated congregation or society. So far as such property may be held by natural persons, for the use of such a congregation or society, it seems to be still controlled by the act of 1813, which vests it at once in the corporation as soon as that may be lawfully formed. But as to property acquired by a religious corporation, for the use of an unincorporated society or congregation, the same consequence does not follow. It was undoubtedly contemplated and intended, by the act of 1850, that the corporation formed by the society should eventually succeed to the title of the property procured, and held for the use of its preceding unincorporated congregation. The act does not in terms declare that to be the case, it is true. But it does not in that respect interfere with the effect given to the incorporation of the society under the preceding law, beyond the condition it imposes, that it shall only be done with the consent of the vestry or trustees of the corporation holding the legal and formal title to the church property. When preceded or accompanied with that consent the property would probably vest in the new corporation, as all church property held for the use of the congregation has been declared to vest, by the fourth section of the act of 1813.

But without that consent the corporation could not be organized by the congregation so as to entitle it, as a matter of strict right, to the property held for the use of the congregation. The statute is clear and explicit on this subject, giving the congregation the right of separate organization and incorporation, only with the consent of the religious corporation under whose fostering care it has been collected and created; upon that being obtained, and a corporation being formed, an independent career will be at once commenced. But without it no right can be secured to succeed to the church property.

In this case it was not claimed that any such consent was obtained before the corporation was formed under the name of the Church of the Redemption. And the judge, before whom the cause was tried, expressly found, that there was no such consent. This conclusion is urged by the plaintiff's counsel as an erroneous one, under the evidence, which it is claimed establishes the performances of acts from which the consent may be inferred.

The consent which the statute rendered necessary for the lawful incorporation of the plaintiff was that of the defendant's vestry, as distinguished from that of individual members of it, and it was contemplated, that it was either to precede or accompany the formation of the corporation. There was no such consent shown or claimed in the case. And upon no occasion afterward, did the defendant's vestry act upon or consider this matter. Corporate action is what the law evidently required, and that has never been taken upon this subject.

The first certificate of incorporation was made and filed in 1864; but that was found to be defective and another was made and filed in its place on the 2d of April, 1866. The defendant's vestry undoubtedly understood that formal proceedings had been taken to incorporate the congregation, and that it claimed to have become an incorporated society; but the existence of that knowledge, without any objection being made to the incorporation, fell very far short of proving the consent, which the statute by express terms had required.

A legacy of $1,017.50 was given by the will of Mrs. Susan M. Parish, to the vestry of Grace church, for the use of its free chapel. It was partially expended in improvements about the new church edifice. In April, 1865, a balance of $269.12 remained on hand, and the defendant's vestry resolved that it should be paid as a donation to Mr. Dickson, rector of the Church of the Redemption, and the treasurer, in January, 1866, reported that he had so paid it. This seems to have been the only favorable action taken by the vestry concerning the new corporation, and it occurred while it was under the defective certificate, which the convention declined to accept as a lawful act of incorporation. It was an incidental recognition of the fact, that there was such a church as the plaintiffs claimed to be, but it was only for the purpose of paying to its rector an amount of money, held by the defendant for the use of the free chapel; and the mode adopted was, substantially, giving the congregation the benefit of the money. From this act it cannot reasonably be inferred, that the vestry intended to convey or give its consent to the formation of the corporation. It could mention, indirectly, what had been done, without involving itself in the expression of a consent, which had never been applied for.

The other acts relied upon are still less favorable to the plaintiff's case, and occurred after the death of Mr. Dickson, which happened in April, 1866, and when serious differences had arisen in the society, concerning the choice of his successor. It is not at all probable that any consent would have been obtained for the act of incorporation while that state of things continued, and which, in the end, resulted in the defendant's vestry taking actual possession of the property.

. The vestry of the defendant was appealed to for assistance in the disagreement which existed; and without any definite action being taken, the wardens and five of the vestrymen of the new church sent in their resignations to the defendant's vestry. That act, instead of indicating the existence of the consent, essential to the formation of the corporation, rather tended to show a conviction of continued dependence, entirely inconsistent with the theory that consent had ever been secured. If it had been, the defendant's vestry was not the body to which the resignations should have been delivered. Other communications were made to the vestry of the defendant, but the latter on no occasion did any thing from which it can justly be inferred, that it intended to give the consent the statute required, in order to render the proceedings of the congregation for its incorporation lawful. The law required some affirmative action for that purpose. The act was to be attended with important results, and required caution and deliberation before it could be properly performed. It may have been contemplated, and the congregation may have relied upon its ability to secure the requisite consent, whenever it should be applied for; but as long as the vestry never gave it, the plaintiff secured no legal right to the property which the congregation had used. The vestry could properly express itself only by direct action, or such long continued acquiesence, as to the fact of incorporation, as would be equal to that in its effect, as evidence of consent, and leave no room for doubt as to its intention in that respect. And neither appeared in this case. It followed, from the want of it, that the defendant's tenure of the property had not been changed. It continued to hold it for the use of the congregation, and not for the plaintiff, even if it can ever be said to have had any existence whatever as a corporate body. The attempt was to form a corporation for the acquisition

and control of this property, and its management for the convenience and use of the society. But that it failed to accomplish.

It was not asserted, that the defendant deprived the congregation of the use of the church property. If it did, the remedy would be by a different action. As long as it is charged with nothing of that kind, no well grounded complaint can exist against it. For the congregation will still be secured the full benefit of all its contributions, by enjoying the advantages intended to be secured by them.

The objection, that the defendant owns a larger amount of property than it has the capacity to hold by law cannot aid the plaintiff's action. That is a matter which the State alone can take advantage of, after the title has become vested, as it clearly had in this case. (*Humbert* v. *Trinity Church*, 24 Wend., 587, 629.) But the objection itself has no foundation to rest upon. This property was acquired and held under section 2 of chapter 122 of the Laws of 1850, and that expressly relieved the defendant, in taking it for the purposes mentioned in the act, from any restrictions contained in the act of 1813.

It appeared that the congregation purchased an organ, a melodeon, Sunday-school library and other articles used in the church for which the plaintiff insists it could recover, even if it cannot maintain the claim made to the church property. But no sufficient reason can be found for distinguishing that from the land and the edifice in which these articles were placed. They were purchased by the contributions of the congregation, in order to complete the enterprise the defendant was engaged in consummating for its use and benefit, and became a part of the general property acquired for that purpose and intended to be held as the rest of it was. At least no evidence of any different intent was given in the case.

The defendant took no further possession of these articles than it was obliged to for the purpose of obtaining possession of the land and church edifice. They went with the possession of the church, because they were in it and incidental to it, and do not seem to have been separately claimed by the plaintiff. And the defendant held them for the benefit of the congregation, which had the equitable right to use them.

Then as long as the incorporation of the plaintiff was not pre-

ceded by, accompanied or sanctioned with the consent of the defendant, it could not lawfully claim against the defendant any portion of the church property. The same disability existed as to the personal, as prevented it from obtaining the real property.

The action, too, was not brought for a conversion of the property, but for an accounting in equity. And if it had been, by a mere exclusion of the plaintiff from the occupancy of the church which contained the personal property, no conversion was in fact established. The defendant took the property, to maintain the use for which it was procured, and the plaintiff has no such interest in it as will enable it to contest the defendant's right to do that.

The fact that the church edifice was destroyed by fire on the night of December 24, 1872, does not change the legal aspect of the case in any respect. At least it has rendered it no more favorable to the plaintiff. It appeared that the edifice, organ and other personal property were insured by the defendant, and the insurance money collected upon the loss. By supplemental complaint the plaintiff claimed those moneys, but as they were paid upon the policies insuring only the defendant's interest in the property, this claim of the plaintiff, for that as well as the other reasons already given, cannot be maintained. The most that can be claimed is that the money shall be applied to rebuilding the edifice, and replacing the organ and furniture, for the use and convenience of the congregation.

The appeal taken from the judgment cannot be sustained. The judgment should therefore be affirmed, with costs.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed, with costs.